GREEN SPRING FARMS, a partnership, Daniel J. Hartung, and John C. Rasmussen, Plaintiffs-Appellants,

v.

E. Campion KERSTEN, Defendant-Respondent-Petitioner.

Supreme Court

*No. 84–1214. Argued October 28, 1986.—Decided March 9, 1987.*

(Also reported in 401 N.W.2d 816.)

For the defendant-respondent-petitioner there were briefs by *John M. Moore* and *Jan A. Smokowicz* and *Bell, Metzner & Gierhart, S.C.*, Madison, and oral argument by *Mr. Smokowicz.*

For the plaintiffs-appellants there was a brief and oral argument by *Roy N. Fine*, Madison.

LOUIS J. CECI, J.   This is a review of a published decision of the court of appeals,[1] entered on December 12, 1985. The issue on review deals with whether and under what circumstances an attorney should be held liable to a nonclient. We adhere to our decision in *Goerke v. Vojvodich*, 67 Wis. 2d 102, 226 N.W.2d 211 (1975), and hold that, under the facts present here, the defendant attorney may not be held liable to the nonclient plaintiffs since there was no showing of fraud nor of any liability flowing from the attorney to the nonclients.[2]

This case centers around the sale of a piece of property to the Green Spring Farms partnership, Daniel J. Hartung and John C. Rasmussen. The closing on the transaction took place on October 10, 1980. The property had been the subject of a mortgage foreclosure action in the fall of 1976. Attorney E. Campion Kersten was retained by the Wisconsin River Development Corporation (WRDC) in the fall of 1976 to represent its interests in the foreclosure

---

[1]*Green Spring Farms v. Kersten*, 128 Wis. 2d 221, 381 N.W.2d 582 (Ct. App. 1985).

[2]Green Spring Farms, Daniel J. Hartung, and John C. Rasmussen, plaintiffs in the trial court, are respondents here. E. Campion Kersten, defendant in the trial court, is the petitioner here. For purposes of clarity in this opinion, we will refer to the parties as plaintiffs and defendant rather than petitioner and respondents.

proceeding which was then pending in the Iowa county circuit court. WRDC's sole shareholder was Willard H. Keland, and defendant dealt primarily, if not exclusively, with Keland in matters relating to his representation of WRDC.

The foreclosure action eventually resulted in a settlement in January, 1980, and a judgment of foreclosure was entered on all the property that was the subject of the proceeding. The settlement agreement provided in part that the 255-acre lot which is the subject of this lawsuit, along with one other parcel of land, would eventually be reconveyed to WRDC. After the settlement agreement had been reached, WRDC, through Kersten and WRDC's broker, George Seymour, began to make efforts to sell the 255-acre tract of farm land.

The facts are largely undisputed, except that the parties disagree about the manner in which Kersten was to be compensated for his representation of WRDC in the foreclosure proceeding and subsequent sale of the property. Kersten has maintained throughout this lawsuit that he was to receive a fixed fee, one that would not fluctuate depending upon the sale price of the property. During his initial representation of WRDC in the foreclosure proceeding, Kersten apparently did agree to a contingency fee arrangement. However, Kersten's counsel stated at oral argument that after WRDC's foreclosure action was completed, Kersten's contingency fee was converted to a fixed-fee mortgage interest in the parcel of property which is the subject of this lawsuit. Counsel conceded, however, that there is nothing in the record which would explicitly confirm that the fee arrangement was modified. Nevertheless, the real estate closing statement does make reference to such a mortgage interest.

308

Plaintiffs have argued, on the other hand, that Kersten charged WRDC for his services strictly on a contingent fee basis, whereby he would get a percentage of the price of any property saved in the foreclosure proceeding and subsequently sold.

In early February, 1980, Ronald D. Offutt, Jr. initially made an offer to purchase the property for the sum of $310,000, which was accepted by WRDC. The closing was to take place on March 17, 1980. A $10,000 earnest money payment was made with the offer to purchase; however, Offutt placed a "stop payment" on the $10,000 check shortly after making the offer.

After the original offer fell through, a decision was nevertheless made to resume negotiations with Offutt. By letter dated February 22, 1980, Kersten agreed to close on Offutt's original offer on June 17, 1980. The letter stated that time was of the essence as to that deadline date. Offutt did not accept this offer, but did submit a counteroffer to WRDC via a letter in July, 1980. This letter containing the new proposal was actually prepared by Kersten at the request of Offutt's attorney. The terms of the proposal, calling for a $300,000 purchase price and a $5,000 earnest money deposit, reflected private negotiations that had been going on between Offutt and Keland. The offer specified a closing date of September 15, 1980, but this time the proposal did not indicate that time was of the essence as to that date. Once again, however, the parties failed to close on the agreed-upon date.

On or about September 10, 1980, after Kersten was informed that Offutt again would not close on the agreed-upon date, he also learned that Leland and Offutt had been conducting further negotiations re-

garding the sale without his knowledge.[3] Specifically, Kersten learned that Keland had pursuaded Offutt to advance another $5,000 on the purchase price to him. Kersten wrote to Keland on that date, warning him not to accept any money from Offutt and stating that the advance could jeopardize WRDC's ability to provide clear title to any other prospective purchaser. However, Kersten was unaware at that time that Keland had already accepted the money. Also, Offutt had apparently negotiated directly with Keland regarding an extension of the agreed-upon closing date, although Kersten testified that he was then unaware that Keland assented to any such agreement.

On September 22, shortly after the closing date deadline had passed, Kersten sent a mailgram to Offutt which advised Offutt that the contract was terminated as a result of his failure to close and that WRDC would retain the earnest money as liquidated damages. However, WRDC also offered to renew the proposed sale agreement, provided that certain conditions were met by September 24. Offutt did not accept this offer and instead made a counterproposal, which Keland found unacceptable. Kersten then wrote letters to both the title insurer on September 25 and the real estate broker on October 9, indicating that the dealings with Offutt had been terminated and that WRDC would be free to deal with other potential buyers.

---

[3]This was not the first time Kersten had learned that Keland had been privately conferring with Offutt. In July or early August, 1980, Keland told Kersten that he had been directly negotiating with Offutt. At that time, Kersten advised Keland to cease these private communications.

During the February to July, 1980, period, Kersten had been negotiating with plaintiffs regarding the sale of the property, but had suspended the negotiations when the sale agreement with Offutt and the September 15 closing had appeared certain. Plaintiffs were advised of the pending sale. After September 24, 1980, Kersten contacted plaintiff Rasmussen and informed him that the deal with Offutt had fallen through because Offutt had proved unable to close and that Keland wished to reinstitute negotiations with Rasmussen, as well as with plaintiffs Hartung and Green Spring Farms, for purchase of the property. The plaintiffs and Keland successfully completed the negotiations, and on October 10, WRDC and plaintiffs Rasmussen and Hartung closed on the sale of the property. At the closing, attorney Robert Jackson was present on Rasmussen's behalf, and attorney Vernon Molbreak was present on behalf of Green Spring Farms. The plaintiffs paid $292,500 to WRDC and received a deed conveying the property to them.

At the time that Kersten had reinstituted negotiations with plaintiffs, he failed to inform them that he had learned, sometime between September 10 and September 24, that Offutt had obtained a conditional loan commitment which would enable him to purchase the property. Kersten knew of this loan commitment. However, he has maintained that while he hoped that the commitment would lead to Offutt's purchase of the property, he nevertheless did not believe that the sale would materialize. In addition, Kersten did not inform plaintiffs that he knew that Keland and Offutt had been personally dealing with one another or that there had been discussion between Offutt aand Keland with regard to an additional $5,000 advance to WRDC. Nor did defendant inform

plaintiffs of any potential claim Offutt might bring with respect to the property; however, defendant stated that prior to the closing he had discussions with the title company and with attorney Jackson and that it was their consensus that Offutt had no legal or equitable interest in the land. In any case, plaintiffs Rasmussen and Hartung were fully aware of the fact that Offutt and WRDC had previously signed a purchase contract.

In negotiating the sale to plaintiffs, Kersten dealt primarily with Rasmussen, although Hartung also took part in discussions with defendant. Kersten dealt with attorneys Jackson and Molbreak as well, but he did so only after the basic terms of the sale agreement had been reached. In any event, attorney Jackson did inquire of Kersten as to previous negotiations with Offutt, he was informed of Offutt's ultimate inability to close, and both agreed that given the breakdown of the negotiations, WRDC was free to deal with other prospective purchasers.

After WRDC and plaintiffs closed the transaction, Offutt brought suit against WRDC and Green Spring Farms for specific performance. On December 1, 1981, Iowa county cicuit court judge James P. Fiedler ruled that Offutt was entitled to specific performance and that the sale to plaintiffs should be set aside. The plaintiffs commenced this action in Iowa county circuit court on October 6, 1983.

In their complaint, the plaintiffs alleged that defendant made misrepresentations of fact in order to induce a sale of the property and that they relied on these misrepresentations to their detriment. Specifically, plaintiffs alleged in their complaint that they relied on written and oral communications made to them by Kersten regarding both the termination of

WRDC's negotiations with Offutt and WRDC's ability and freedom to negotiate with other prospective purchasers.[4]

Kersten responded to plaintiffs' complaint by filing a motion to dismiss, along with a supporting affidavit in which defendant again stated that the dealings with Offutt were terminated because of Offutt's inability to close and that at no time during his dealings with plaintiffs was he informed by Keland that he was still dealing directly with Offutt or that an extension of the September 15 closing date had ever been actually granted. Plaintiffs submitted an opposing affidavit and, because matters outside the pleadings were presented to the court, the trial court elected to treat the motion to dismiss as a motion for summary judgment. Section 802.06(2), Stats.

Relying on its reading of *Goerke*, the trial court granted defendant's summary judgment motion, finding that defendant could not be held liable absent some fraudulent conduct on his part toward the nonclient plaintiffs. Although the trial court believed that a claim for fraud was stated, it did not believe the facts supported a finding of fraud. The court found instead that defendant's dealings with plaintiffs were "above board" and that the representations relied on by plaintiffs were in fact made by Kersten in good faith. The court stated that defendant's actions "at most were negligent," but that even if Kersten was indeed negligent, Wisconsin law did not recognize a

---

[4]Plaintiffs charged that they also relied on misrepresentations which were made to the real estate broker and, in turn, communicated to them. Finally, they also charged that they relied on covenants made in the deed conveying the property which indicated that the land was free from encumbrances.

cause of action for nonclients who suffered damage as a result of an attorney's negligent conduct.

The court of appeals reversed the trial court's grant of summary judgment to the defendant. Although it believed that no allegations of fraud were made, it did believe that the complaint stated a claim for strict liability for misrepresentation. The alleged misrepresentation was Kersten's statement to plaintiffs to the effect that the previous contract to sell the property to Offutt had been terminated. The appeals court did not believe that the *Goerke* rule, requiring fraud as a prerequisite to liability, was applicable. Instead, it believed that since defendant stood to benefit financially from the transaction, his "liability for misrepresentation should be no greater or less than that of a seller who by definition has an economic interest in a real estate transaction." 128 Wis. 2d at 227–28.

On review, this court must determine whether the appeals court was correct in holding that defendant could be held liable using a strict liability analysis. We hold that the appeals court incorrectly utilized a strict liability analysis in reaching its decision and, accordingly, we reverse. We also find, however, that Kersten cannot be found liable utilizing negligence principles because, under the facts of this case, *Goerke* controls.

■

Appeal in this case was originally taken from the entry of summary judgment in Kersten's favor. There is a standard methodology which a trial court follows when faced with a motion for summary judgment. *See, Grams v. Boss,* 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980); *Kraemer Bros. v. United States Fire Ins. Co.,* 89 Wis. 2d 555, 566–67, 278 N.W.2d (1979); *Prah v. Maretti,* 108 Wis. 2d 223, 228, 321 N.W.2d 182 (1982).

The first step of that methodology requires the court to examine the pleadings to determine whether a claim for relief has been stated. *Kanack v. Kremski*, 96 Wis. 2d 426, 430, 291 N.W.2d 864 (1980).

If a claim for relief has been stated, the inquiry then shifts to whether any factual issues exist. Under sec. 802.08(2), Stats., summary judgment must be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

When this court is called upon to review the grant of a summary judgment motion, as we are here, we are governed by the standard articulated in sec. 802.08(2), *Maynard v. Port Publication, Inc.*, 98 Wis. 2d 555, 558, 297 N.W.2d 500 (1980), and we are thus required to apply the standards set forth in the statute just as the trial court applied those standards. *Wright v. Hasley*, 86 Wis. 2d 572, 579, 273 N.W.2d 319 (1979).

Before we proceed with our analysis of whether summary judgment was warranted, however, we first wish to reaffirm this court's adherence to the standard of review articulated in *Wright*. We believe that a reaffirmation of that standard is necessary due to certain inconsistencies which have evidently arisen subsequent to this court's decision in *Wright*.

The court in *Wright* stated that the enactment of sec. 802.08, Stats., replacing sec. 270.635, called for a "more exacting appellate scrutiny of the trial court's decision not to grant summary judgment." *Id*. at 578. Old sec. 270.635 prescribed those situations where summary judgment may be entered, while the new

rule, in contrast, describes those situations where summary judgment shall be entered.

In *Wright*, the court stated that because sec. 270.635 was merely discretionary, appellate review was necessarily quite deferential. After making that statement, it cited cases which had described the standard of review under sec. 270.635 as an abuse of discretion standard, *see, e.g., American Orthodontics Corp. v. G & H Ins. Agency, Inc.*, 77 Wis. 2d 337, 343, 253 N.W.2d 82 (1977). It then went on to state that since new sec. 802.08 contained the word "shall"—mandatory language—a reviewing court can "no longer accord the trial court wide latitude in deciding to grant or deny summary judgment." *Wright*, 86 Wis. 2d at 578. It therefore stated that, "We, like the federal appellate courts, proceed here to review the trial court's decision by applying, just as the trial court applied, the standards and methods set forth in the new rule." *Id.* at 579. We have today reaffirmed that principle, and it has been utilized extensively in other cases involving summary judgment motions. *See, Brown v. Hammermill Paper Co.*, 88 Wis. 2d 224, 231, 276 N.W.2d 709 (1979); *Alonge v. Rodriquez*, 89 Wis. 2d 544, 553, 279 N.W.2d 207 (1979); *Hortman v. Becker Const. Co., Inc.*, 92 Wis. 2d 210, 219, 284 N.W.2d 621 (1979); *Heck & Paetow Claim Service, Inc. v. Heck*, 93 Wis. 2d 349, 356, 286 N.W.2d 831 (1980); and *Kanack*, 96 Wis. 2d at 430.

However, in *Arnold v. Shawano County Agricultural Society*, 111 Wis. 2d 203, 330 N.W.2d 773 (1983), the court stated that the standard of review on appeal "is whether the trial court abused its discretion in granting the motion for summary judgment." It further stated that, "We will reverse only if the trial

court incorrectly decided a legal issue or material facts are in dispute." *Id.* at 209.

We now wish to clarify any existing ambiguity by unequivocally stating that the *Wright* standard should properly be applied in a summary judgment analysis. To the extent that the *Arnold* language may be construed so as to retain or advance the abuse of discretion standard which the *Wright* standard supplanted, that language is hereby withdrawn.

Applying the summary judgment methodology just as the trial courts are obliged to do, our first task is to determine whether plaintiffs have stated a claim for relief. In testing the sufficiency of a complaint, we take all facts pleaded by plaintiffs and all inferences which can reasonably be derived from those facts as true. Pleadings are to be liberally construed, with a view toward substantial justice to the parties. Section 802.02(6), Stats. The complaint should be dismissed as legally insufficient only if it is quite clear that under no circumstances can plaintiffs recover. *Prah*, 108 Wis. 2d at 229.

Plaintiffs, on appeal to this court, advance two potential bases for liability: (1) negligent misrepresentation and (2) strict liability for misrepresentation. The complaint alleges that: (1) Kersten represented that the property in question was free from encumbrances, WRDC could sell the property, the property was indeed for sale, and WRDC's prior dealings with Offutt were terminated; (2) these representations were untrue; (3) plaintiffs believed these representations were true and relied on them to their detriment; (4) Kersten made the representations from his own personal knowledge such that he knew or should have

317

known that the representations he made were untrue; (5) Kersten's representations materially induced plaintiffs to enter into the transaction; and (6) Kersten had an economic interest in the transaction and stood to benefit if plaintiffs entered into it.

First, we believe that, contrary to the finding of the trial court, plaintiffs have not initially stated a claim for relief in fraud.[5] The complaint does allege that several of the necessary elements of fraud are present. For example, the complaint does state that the misrepresentations induced plaintiffs to enter into the transaction; it does not, however, state that their inducements to act were the result of an intent to defraud on Kersten's part.

Here, the alleged misrepresentation was defendant's statement to the effect that Offutt had proven unable to close, thus rendering WRDC able to deal with alternate buyers. Defendant has contended throughout that he believed in good faith that the deal with Offutt would ultimately not be consummated. The complaint is not inconsistent with this contention as it does not allege that the statements made by Kersten were made in bad faith or with an intent to defraud. Since a claim in fraud has not been stated, we need not proceed to the next step of the summary judgment methodology under sec. 802.08(2), Stats. Therefore, if plaintiffs are to succeed here, their

[5]The elements of fraudulent misrepresentation have been defined as follows: (1) a false representation, (2) made with the intent to defraud and for the purpose of inducing another to act upon it, and (3) actually inducing another to rely and act upon that representation, causing injury or damage. *Ollerman v. O'Rourke Co., Inc.*, 94 Wis. 2d 17, 25, 288 N.W.2d 95 (1980); *Goerke*, 67 Wis. 2d at 107.

complaint must state a claim for relief that is based on some other theory of liability. We now examine the complaint to determine whether other claims for relief have been articulated.

## I.

Plaintiffs argue that liability should be imposed based upon a theory of negligent misrepresentation, which requires a showing that defendant made a misrepresentation of fact upon which the plaintiffs relied to their detriment. The specific elements of a cause of action in negligence are: (1) a duty of care or a voluntary assumption of a duty on the part of the defendant; (2) a breach of the duty (which involves a failure to exercise ordinary care in making a representation or in ascertaining the facts); (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury. *Ollerman*, 94 Wis. 2d at 46.

Although the complaint does not specifically allege each of these elements, plaintiffs contend in their brief that inferences may be drawn from the complaint that Kersten could be held liable for "negligently representing that the transaction with Offutt had fallen through under circumstances in which the reasonable and prudent attorney would not have made such representations." Plaintiffs' complaint does generally allege that Kersten either knew or should have known that the representations he made were false.[6] This allegation, when liberally

[6]Paragraph 12 of plaintiffs' complaint alleges that:

construed, seems to satisfy the criterion for stating a claim for negligent misrepresentation, which is based upon a failure of the speaker to exercise reasonable care in making the representation. *Ollerman*, 94 Wis. 2d at 45, citing *Stevenson v. Barwineck*, 8 Wis. 2d 557, 563, 564, 99 N.W.2d 690 (1959).

Although we recognize that plaintiffs have stated a claim for negligent misrepresentation to third parties, we now must determine whether any factual issues exist and whether defendant is entitled to judgment as a matter of law. We determine that, under the facts of this case, with respect to the claim for negligent misrepresentation, no genuine factual issues exist, and defendant is entitled to summary judgment as a matter of law. Section 802.08(2), Stats.

First, we believe there are no material factual issues which are in dispute, although the parties advocate different positions with respect to the method by which Kersten was to be compensated. We believe that plaintiffs have incorrectly characterized the method of compensation as that of payment via a fluctuating contingent fee. Plaintiffs maintain that payment of Kersten's attorney's fees was dependent upon both the sale of the property in question and the sale price of the property. While it is accurate to state that Kersten would not obtain payment until the

"12. At the time the defendant made the representations, such representations were from his own personal knowledge and he was so situated that he either had particular means of ascertaining pertinent facts, or his position as attorney for Wisconsin River Development Corporation made possible complete knowledge and his statements fairly implied that he had such knowledge, or he should have known that his representations were untrue."

property was sold, the amount of payment, upon sale, was indeed fixed. Kersten had a second mortgage on the parcel. The buyers' settlement statement between WRDC and plaintiffs Rasmussen and Green Spring Farms, dated October 10, 1980, states that Kersten's law firm, Kersten & McKinnon, had a second mortgage on the property in the amount of $94,057.21. There is nothing in the record to indicate otherwise, and, therefore, we consider the method of compensation for attorney's fees to be undisputed and consider it irrelevant that payment was contingent upon the future sale of this property. The actual dollar amount of the fee to be paid was not in dispute.

An additional basis for our decision can be found in this court's holding in *Goerke*, which governs attorney liability to third parties in Wisconsin. *Goerke* requires affirmative proof of fraudulent conduct on the attorney's part before that attorney may be held liable to a nonclient. The trial court was correct in relying upon *Goerke* in reaching its holding. We now decline to expand or modify *Goerke*.

■

The court in *Goerke* addressed the question of whether the seller's attorney could be held liable to the purchasers in a real estate transaction for his failure to inform them that the seller was incompetent at the time of sale. In reaching its holding, the court first noted that the general rule in Wisconsin was that an attorney could not be held liable to third parties for any acts committed within the scope of an attorney-client agency relationship, *Scandrett v. Greenhouse*, 244 Wis. 108, 112, 11 N.W.2d 510 (1943), but that there were some exceptions to the rule. *Goerke*, 67 Wis. 2d at 106. *Goerke* explicitly stated that an exception to the general rule of attorney immunity

from liability to nonclients exists when an attorney's conduct is fraudulent[7] with respect to nonclients. Specifically, the court stated that,

> "In those cases of arm's-length negotiations leading to the consummation of a contract such as in the case here, before liability can be imposed upon the attorney for the opposing party to the contract it must be shown that the attorney actually intended to mislead or misinform the other party and, in fact, does so to the detriment of the party." *Id.* at 108.

An attorney may not be held liable for "mere negligence." *Id.* at 105, quoting 7 C.J.S., *Attorney and Client*, sec. 52 b at 834. Our later decisions have not departed from the *Goerke* rule. *See, Strid v. Converse*, 111 Wis. 2d 418, 331 N.W.2d 350 (1983).

In *Auric v. Continental Cas. Co.*, 111 Wis. 2d 507, 331 N.W.2d 325 (1983), this court created another exception to the general rule of immunity to nonclients in the will-drafting context. There, the defendant attorney was instructed by his client to draft a will, making the client's brother a beneficiary of the will. The attorney failed to obtain the signature of the requisite number of witnesses and, as a result, the will was denied probate and the brother did not receive his expected inheritance. In this limited context, the court held that the attorney could be liable to the intended beneficiary of a will, even though he was not in privity with the attorney. *Id.* at 512–14. In reaching this holding, the court relied on a balancing-test approach, first articulated in a California case, which requires that a court consider the following factors to determine whether an attorney should be subjected to

---

[7]*See*, n. 5, *supra*.

liability: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered harm; (4) the nexus between the defendant's conduct and the plaintiff's harm; and (5) the policy of preventing future harm. 111 Wis. 2d at 514, citing *Lucas v. Hamm*, 56 Cal. 2d 583, 588, 364 P.2d 685, 687, 15 Cal. Rptr. 821, 823 (1961), *cert. denied* 368 U.S. 987 (1962).

*Goerke* and *Auric* involved omissions by the attorney, that is, in *Goerke*, the attorney failed to inform buyers of the seller's negligence, and in *Auric*, the attorney failed to follow the proper attestation procedures. *Rusch v. Wald*, 202 Wis. 462, 232 N.W. 875 (1930), on the other hand, involved a commission on the part of the attorney. In that case, an attorney fraudulently deceived the plaintiff by stating that real estate plaintiff intended to purchase was unencumbered, when in fact the attorney knew an ordinance prevented use of the land in the manner in which plaintiff had planned to use it. In ruling for the plaintiff, the court in *Rusch* stressed the fact of the attorney's superior knowledge in real estate and plaintiff's ignorance in that area.

This case, however, although arguably involving a commission on Kersten's part, cannot be successfully analogized to *Rusch*. Plaintiffs had the benefit of counsel; they were not uninformed about WRDC's prior negotiations with Offutt; and they were aware of Offutt's potential for claiming a legal or equitable interest in the property in question.[8] Thus, plaintiffs

---

[8]Attorney Jackson, who represented plaintiff Rasmussen, discussed the potential for such an interest with Kersten and

were not unaware of the potential for problems and had the benefit of the presence of counsel to ensure them that they would enjoy relative equality of bargaining power with respect to the real estate transaction. Under these circumstances, plaintiffs were not entitled to rely exclusively on Kersten, as distinguished from *Rusch*, where the court determined that the plaintiff was entitled to rely on the defendant attorney.

Language in *Goerke* supports our conclusion that *Rusch* should not be relied on. In rejecting the claim of fraud in *Goerke* advanced by the buyers of real estate against the respondent real estate brokers, the court noted that respondents, who failed to disclose the incompetence of the seller of real estate, were entitled to assume that appellants (the buyers) would undertake a reasonable investigation or make reasonable inquiries as to the capacity of the party with whom they were contracting. Similarly, especially since plaintiffs here were aware of potential problems with respect to claims to the property, Kersten could have reasonably assumed that plaintiffs or their attorneys would inquire further about Offutt's status if it concerned them. One of the attorneys did so inquire and appeared satisfied with Kersten's response.

Nevertheless, plaintiffs argue that this court should look beyond these well-settled authorities and adopt either a strict liability or a negligence standard for imposing liability on attorneys for representations they make to nonclients. They argue that our decision in *Stevenson*, 8 Wis. 2d 557, provides the basis for adopting either standard. The plaintiffs in that case

apparently ultimately agreed with Kersten that Offutt had no valid claim for such an interest.

brought suit against defendant real estate brokers for misrepresentation, allegedly due to defendants' failure to inform plaintiffs that a house they purchased could not be converted to a four-family apartment unit under existing city building permits. Plaintiffs purchased the dwelling with the understanding that they would convert it from an existing two-family use to a four-family use. Defendants had initially listed the property as a four-family rental unit and did not inform plaintiffs that there was no city approval for conversion of the building to plaintiffs' desired use. In their complaint, plaintiffs alleged that defendants knew or should have known that the property was not a four-family dwelling.

After first deciding that defendants believed that the representations they made were true, the court then addressed the question of whether liability could be imposed if defendants "ought to have known" that their representations were untrue. The *Stevenson* court discussed strict liability principles but stated that the determination of whether defendants should be held liable on that basis was not resolvable under the summary judgment motion brought in that case. Instead, it focused on negligence as a basis of liability and found that the facts in that case did not exclude the possibility that defendants failed to exercise reasonable care.[9]

Plaintiffs rely heavily on the *Stevenson* case and, in addition, cite several other cases which would

---

[9]The court cited the following language from Prosser, *Law of Torts* (2d ed.), sec. 88 at 541, with approval: "'A representation made with an honest belief in its truth may still be negligent, because of lack of reasonable care in ascertaining the facts, or in the manner of expression, or absence of the skill and competence required by a particular business or profession.'" 8 Wis. 2d at 564.

support the imposition of liability on a negligence basis. In particular, they rely on several California cases where an individual has been held liable to third parties on a negligence basis. *See, Biakanja v. Irving*, 49 Cal. 2d 647, 320 P.2d 16 (1958) (defendant notary public held liable to an intended beneficiary of testator's will after the will, which he had prepared, was denied probate because of his negligent failure to have it properly attested); *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz*, 57 Cal. App. 3d 104, 128 Cal. Rptr. 901 (1976) (attorneys held liable on negligent misrepresentation grounds for issuing a legal opinion letter to plaintiff for the purpose of inducing plaintiff to loan money to a partnership, which letter failed to inform plaintiff that the attorneys had doubts as to the status of the partnership as either a general or limited partnership); *Morales v. Field, DeGoff, Huppert & MacGowan*, 99 Cal. App. 3d 307, 160 Cal. Rptr. 239 (1979) (defendant law firm held liable to third-party beneficiary of a trust for negligent conduct in connection with its representation of the trustee bank, despite the fact that its conduct did not amount to active participation in a breach of the trust).

In imposing liability, each of these cases has relied on the balancing-test approach first articulated in the *Lucas* case and adopted by this court in the will context in *Auric*. 111 Wis. 2d at 514. Thus far, Wisconsin has restricted its use of the *Lucas* balancing-test approach to the will context, and our examination of the cases cited by plaintiffs which also utilize the *Lucas* test simply reaffirms our belief that a limited application of the *Lucas* methodology is proper. The cases cited by plaintiffs are limited to the will and trust beneficiary fact setting, where the defendants knew that specific individuals stood to benefit

from their actions and that if they acted negligently with respect to their duties, those individuals could be deprived of their expected benefits. In fact, in *Biakanja*, the "'end and aim' of the transaction was to provide for the passing of [the] estate to plaintiff." 49 Cal. 2d at 650, 320 P.2d at 19 (citation omitted). Similarly, the *Morales* case involved attorney representation of a trustee. A trustee is bound by law to act in good faith so as to fulfill all trust obligations for trust beneficiaries. In *Morales*, as in *Biakanja*, it was clear that the defendant had a duty, whether direct or indirect, to the plaintiffs involved. Plaintiffs were the intended beneficiaries of defendant's actions in both of those cases. This case cannot be successfully analogized to the *Biakanja* and *Morales* decisions because plaintiffs here were not the intended beneficiaries of defendant's actions to whom defendant owed a duty of due care. Also, *see, Held v. Arant*, 67 Cal. App. 3d 748, 751, 134 Cal. Rptr. 422, 423 (1977), where the court refused to find an attorney liable on negligence theories because "an attorney's liability for negligence, like that of all other persons, is limited by the concept of duty. The lawyer's duty of care extends only to the intended beneficiaries of his action." ·

Significantly, *Morales* also implied that had the attorneys there been negotiating in an arm's-length manner vis-a-vis the trust beneficiaries, the outcome might be different.[10] The *Morales* court cited *Goodman v. Kennedy*, 18 Cal. 3d 335, 556 P.2d 737, 134 Cal. Rptr. 375 (1976), to support this statement. In *Goodman*, the defendant attorney represented his clients, the sellers in a sale of stock. Plaintiffs alleged that the defendant negligently failed to inform his clients of certain

[10] 99 Cal. App. 3d at 316, 160 Cal. Rptr. at 244.

adverse consequences of selling the stock and to apprise plaintiffs of facts which might have notified them of the adverse consequences as well. Plaintiffs in *Goodman* essentially argued that because the attorney's advice to his clients related to a sale of stock by them, defendant's duty in giving the advice extended to anyone, plaintiffs included, to whom the sale might be made. 18 Cal. 3d at 344, 556 P.2d at 743, 134 Cal. Rptr. at 381. Plaintiffs in this case similarly appear to advance an argument in favor of a broad extension of liability to protect a widening class of possible plaintiffs.

The court in *Goodman* held that the defendant attorney was not liable to the third-party buyers because, in contrast to *Morales* and *Biakanja*, the attorney in that case did not have a duty to benefit the buyers, either directly or indirectly. The court in that case addressed the buyers' arguments, similar to those advanced here, that liability should be imposed because the defendant attorney's advice regarding the sale was intended to affect plaintiffs and because the defendant could have anticipated that plaintiffs would suffer harm as a result of defendant's erroneous advice. The *Goodman* court believed that the defendant attorney owed no duty to the buyers because the parties were negotiating at arm's length to effectuate the stock purchase. *Id.*

We similarly believe that Kersten was not subject to a duty to the plaintiffs. First, we believe it would be improvident to hold that the defendant could be found liable in a situation where, as here, arm's-length negotiations were involved. A strong indicator that arm's-length negotiations have taken place is the fact that the parties have retained separate counsel. *See,*

*Morales*, 99 Cal. App. 3d at 316–18, 160 Cal. Rptr. at 244–45. While not necessarily true in all cases, the fact that a party has chosen to be represented by counsel in a given transaction may imply that the parties have separate adverse interests that they wish to protect throughout the proceedings. *Id.* If we were to hold that an attorney could be held liable under circumstances similar to those present in this case, we would be creating a cause of action by which a party could sue the opposing party's counsel even though that counsel owed no duty to plaintiffs. *See, Cramer v. Metropolitan Savings Ass'n*, 125 Mich. App. 664, 674, 337 N.W.2d 264, 268 (1983); *Omega Video Inc. v. Superior Court*, 146 Cal. App. 3d 470, 194 Cal. Rptr. 574 (1983).

To avoid such a broad extension of the attorney's duty to third parties when adversarial proceedings are involved, courts have refused to impose liability on the defendant attorney unless a showing of fraud has been made. An additional policy reason not to extend an attorney's liability to adversarial third parties not in privity with the attorney is that to do so may create what we view to be potentially damaging effects on the defendant attorney's relationship with his or her own client. That is, if an attorney must be responsible not only to his or her own client but also to a third-party nonclient, a potential conflict of interest may be inevitable, thus impairing an attorney's ethical obligations to represent his or her own client zealously within the bounds of the law.[11] *See, Flaherty v.*

[11]*See*, SCR 20.23(1) (1986), which states that, "The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of the client and free of compromising influences and loyalties. Neither his or her personal interest,

*Weinberg*, 303 Md. 115, 131, 492 A.2d 618, 626 (1985); *Goodman*, 18 Cal. 3d at 344, 556 P.2d at 743, 134 Cal. Rptr. at 381; *Page v. Frazier*, 388 Mass. 55, 63, 445 N.E.2d 148, 153 (1983).

We find that these authorities and principles are persuasive when applied to the facts of this case. In general, the parties to a real estate transaction do have adverse interests. *See, Page*, 388 Mass. at 63, 445 N.E.2d at 153; *Adams v. Chenowith*, 349 So. 2d 230, 231 (Fla. Dist. Ct. App. 1977). In this case, Kersten was representing his client's individual interests in attempting to bring about a sale of the WRDC property. He did not represent plaintiffs, nor did he purport to represent their interests. Plaintiffs had the benefit of their own separate counsel. The record supports the conclusion that the parties' interests were adverse.[12]

the interests of other clients, nor the desires of 3rd persons should be permitted to dilute a lawyer's loyalty to a client." Also, *see, Chaplin v. Brennan*, 114 Ariz. 124, 559 P.2d 680 (Ct. App. 1977), where the court refused to impose liability on the defendant attorney for material misrepresentation of fact made by him to the plaintiffs. The court held, consistent with SCR 20.23(1), that the attorney could not be held liable to the plaintiff because the attorney's legal responsibilities were to his client alone and not to any third party.

[12]Given the significant amount of money involved (the purchase price was $292,500), combined with the difficulties known to plaintiffs of concluding the deal with Offutt and of a possible claim by Offutt to an equitable interest in the land, it is not at all unusual that plaintiffs chose to retain separate counsel to protect their own interests. Furthermore, the fact that Rasmussen's attorney made inquiries regarding the termination of the deal with Offutt shows that counsel was concerned about protecting Rasmussen's individual interests. Under these circumstances, it seems highly improbable that plaintiffs could have been justified in believing that they could or should look solely to Kersten for professional advice regarding the transaction.

Kersten did not provide plaintiffs with any formal opinion letters which he could anticipate they might rely on in entering into the transaction.

For these reasons, and under these facts, we decline to hold that Kersten could be held liable under negligence principles to the third-party, nonclient plaintiffs.

## II.

Finally, we address plaintiffs' argument that the court of appeals correctly applied a strict liability analysis to find defendant liable.[13] We disagree. Wisconsin has not yet explicitly recognized a cause of action utilizing strict liability principles by which a plaintiff may successfully sue a defendant attorney with whom he or she has no privity.

The appeals court believed *Goerke* to be inapplicable because Kersten had an economic interest in the transaction. Since Kersten had an economic interest in the transaction, the appeals court believed that "[Kersten's] liability for misrepresentation should be no greater or less than that of a seller who by definition has an economic interest in a real estate

[13]The elements of strict liability for misrepresentation that the appeals court thought were satisfied are: "(1) that defendant made a representation of fact; (2) that the representation was untrue; (3) that defendant represented the fact from his personal knowledge or was so situated that he either had particular means of ascertaining the pertinent facts, or his position made possible complete knowledge and his statements fairly implied that he had it; (4) that defendant had an economic interest in the transaction in that defendant stood to make a financial gain if the plaintiff entered it; and (5) that plaintiff believed the representation to be true and relied on it." 128 Wis. 2d at 225–26.

transaction." 128 Wis. 2d at 228. It then went on to apply a strict liability analysis to the facts of this case, relying on the *Stevenson* case, 8 Wis. 2d 557, for support to find Kersten liable.

We need not delve into the details of the court's strict liability analysis as applied to the facts of this case because we find that they improperly applied it in the first instance. *Stevenson* can be distinguished on its facts,[14] and, therefore, any analogies to that case are not properly made. We hold that the appeals court incorrectly utilized strict liability principals to find defendant liable, and, accordingly, we reverse the decision of the court of appeals and affirm the judgement of the trial court.

*By the Court.*—The decision of the court of appeals is reversed.

SHIRLEY S. ABRAHAMSON, J. *(concurring).* I agree with the mandate. I do not join the majority opinion because I find that I cannot follow the rationale set forth.

---

[14]The defendants in that case were real estate brokers, not attorneys.