Hilario CUELLAR, Jr. and Michael McVicker,
Plaintiffs-Appellants,

v.

FORD MOTOR COMPANY, Defendant-Respondent.†

Court of Appeals

*No. 2005AP2003. Oral argument August 1, 2006.
—Decided September 12, 2006.*

2006 WI App 210

(Also reported in 723 N.W.2d 747.)

† Petition to review denied 1/9/07.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Douglas P. Dehler* of

*Shepherd, Finkelman, Miller & Shah, LLC*, Milwaukee, *James E. Miller* and *Patrick A. Klingman* of *Shepherd, Finkelman, Miller & Shah, LLC*, Chester, CT and *James C. Shah* and *Nathan Zipperian* of *Shepherd, Finkelman, Miller & Shah, LLC*, Media, PA.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Michael J. Gonring* and *M. Christine Cowles* of *Quarles & Brady LLP*, Milwaukee and *Brian C. Anderson, William R. Nifong* and *Scott M. Hammack* of *O'Melveny & Myers LLP*, Washington, D.C.

Before Wedemeyer, P.J., Curley and Kessler, JJ.

¶ 1. WEDEMEYER, P.J. Hilario Cuellar, Jr. and Michael McVicker appeal from a judgment entered after summary judgment dismissing their claim alleging that an "upgrade program," offered by Ford Motor Company ("Ford") to certain vehicle owners, violated the Wisconsin Motor Vehicle Adjustment Programs Act ("MVAPA"). *See* WIS. STAT. § 218.0172 (2003–04).[1] Cuellar and McVicker claim that the trial court erred in ruling that Ford's "upgrade program" did not fall under the MVAPA statute.[2] Because the undisputed facts demonstrate that the upgrade program did constitute an "extended policy program" subject to the MVAPA, we conclude that the trial court erred in granting summary

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[2] Appellants also argue that the trial court erred in ruling that they did not have standing to bring a claim under the statute. We agree. The standing issue, however, is intermingled with the discussion of whether the statute applies to the facts of this case and therefore will be addressed within that discussion.

judgment in this case. Accordingly, we reverse the judgment and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶ 2. On October 22, 2004, Cuellar and McVicker filed a class action suit against Ford on behalf of owners and lessees of model years 1992–2003 Panther Platform vehicles[3] registered in the state of Wisconsin. Cuellar and McVicker alleged that the Police Package Upgrade Kit, offered to law enforcement agencies for installation on Crown Victoria Police Interceptor ("CVPI") vehicles, constituted an adjustment program (or "secret warranty") under the MVAPA, and that Ford was therefore required to notify all owners of Panther Platform vehicles of the availability of the upgrade kit.

¶ 3. The upgrade kit is designed to bolster the integrity of the fuel tank which is vertically mounted in the "crush zone" of Panther Platform vehicles, just behind the rear axle.[4] The placement of the fuel tank in these vehicles creates the risk of puncture when one of

---

[3] Ford produced several automobile models based on its "Panther Platform" vehicles in model years 1992–2003. These included the Ford Crown Victoria, Mercury Grand Marquis and Lincoln Town Car. During this period, Ford also produced a "Panther Platform" vehicle which was marketed and available only to law enforcement agencies, the Crown Victoria Police Interceptor or "CVPI." Although CVPIs are produced with features specially tailored to the demands of law enforcement, they are identical to the consumer models in all respects material to this action. Hereafter, these vehicles are collectively referred to as "Panther Platform vehicles."

[4] The upgrade kit consists of: (1) a revised emission canister mounting; (2) fuel tank strap isolators; (3) a differential cover shield; and (4) axle shields.

the vehicles is exposed to crushing forces from behind. As a result, there is a substantial risk that rear-end collisions can lead to fuel leaks and fuel-related fires. Over 300,000 upgrade kits have been made available for installation on CVPIs owned and operated by law enforcement agencies. All related costs for the installation of these kits have been absorbed by Ford.[5] Ford does not offer installation of the upgrade kit, or reimbursement of related expenses, for Panther Platform vehicles not owned and operated by law enforcement agencies.[6]

¶ 4. Prior to the development and implementation of the upgrade kit, Ford issued Technical Service Bulletin 01–21–14 ("TSB 01–21–14") which set forth a predecessor repair to the fuel tank on all Panther Platform vehicles for model years 1992–2001.[7] Ford indicated that the repairs provided for under TSB 01–21–14 were covered under the provisions of the bumper-to-bumper warranty on these vehicles, and the repairs were offered free of charge. Ford, however,

---

[5] The cost of the upgrade kit is approximately $105, plus labor charges. To date, neither Cuellar nor McVicker have installed the upgrade kit on their vehicles or incurred any costs related to such installation. Their counsel represented at oral argument before this court that obtaining the kit is impossible as Ford refuses to sell it to owners of non-law enforcement vehicles.

[6] Ford has also offered installation of the upgrade kit on non-CVPI Panther Platform vehicles which are owned and operated by law enforcement agencies.

[7] TSB 01–21–14 was issued on October 22, 2001, and recommended the following repairs in connection with the fuel tank on Panther Platform vehicles: (1) replacement of the park brake cable to axle attaching hex head fastener for 1992–97 vehicles; and (2) grind the tab from both u-brackets on the rear of the stabilizer bar.

failed to notify owners and lessees of Panther Platform vehicles that they were eligible for the repairs offered under TSB 01–21–14.[8] Ford discontinued TSB 01–21–14 after complaints were filed with the Wisconsin attorney general for failure to make the repairs available to all Panther Platform vehicle owners. On or about October 22, 2002, Ford adopted the upgrade kit program, which superseded the repairs previously offered under TSB 01–21–14.

¶ 5. On December 13, 2004, in response to the complaint filed by Cuellar and McVicker, and prior to any discovery being conducted, Ford filed a motion to dismiss for failure to state a claim upon which relief could be granted, pursuant to WIS. STAT. § 802.06. After receiving a memorandum opposing the motion from Cuellar and McVicker, and a supporting brief from Ford, the trial court held oral argument. At the hearing, the trial court acknowledged that the complaint sufficiently stated a claim for relief to defeat the motion to dismiss; however, the court decided, *sua sponte,* to convert Ford's motion to a motion for summary judgment. The court directed the parties to simultaneously submit additional briefings addressing specific questions posed. These submissions were to include "whatever evidentiary information [the parties] might think is necessary to support [their] position." In response to these instructions, Cuellar and McVicker requested a period of discovery, arguing that the simultaneous submissions requested by the court would not provide a sufficient opportunity for each party to test the other's

---

[8] Any potential violation of the MVAPA relating to TSB 01–21–14 is currently the subject of a separate action pending in Milwaukee County, Wisconsin at the time of this decision.

evidentiary submissions. Ford argued that no discovery was needed, and the court agreed.

¶ 6. On March 21, 2005, the parties submitted their respective answers to the questions posed by the court and, on April 4, 2005, reply briefs were submitted. The trial court held a hearing on the converted motion for summary judgment on April 29, 2005, and granted summary judgment in favor of Ford. The court found that the upgrade kit did not repair a defect,[9] as required to state a claim under the MVAPA. Further, the trial court ruled that Cuellar and McVicker failed to establish the need for the repair or a pecuniary loss associated with procuring the repair; therefore, they could not make a claim under the MVAPA. Finally, the court reasoned that the upgrade kit was a safety enhancement for CVPIs, tailored to situations unique to police work,[10] and that this fact supported the trial court's finding that the kit did not constitute a repair sufficient to support a claim under the MVAPA.

¶ 7. The order for judgment was entered on June 17, 2005, and this appeal followed.

## DISCUSSION

¶ 8. This appeal arises from the granting of a summary judgment. In reviewing summary judgments,

---

[9] This finding was based on: (1) a National Highway Transportation Safety Administration review of the Panther Platform vehicles fuel system, in which it found no defect; and (2) the plaintiffs' admission that they had not incurred any expenses to repair their vehicles.

[10] Vehicles owned and operated by law enforcement agencies face an exponentially greater risk of high-speed rear-end impacts due to the frequency with which police officers are stopped alongside interstate highways.

our standard of review is well known and in accord with Wis. Stat. § 802.08. We employ the same methodology as the trial court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). We first examine the pleadings and affidavits to determine whether a claim for relief has been stated. *Id.* If a claim for relief has been stated, we then determine whether any factual issues exist. *Id.* If there is no genuine issue as to any material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the trial court's decision granting summary judgment. *Id.* Our review is *de novo. Id.*

¶ 9. Here, Cuellar contends that the trial court erred as a matter of law in concluding that Ford's upgrade kit was not an adjustment program under the MVAPA. Reviewing the trial court's conclusion requires interpretation of the statute based on the undisputed facts, which presents a question of law that we review independently. *See Bitters v. Milcut, Inc.*, 117 Wis. 2d 48, 49, 343 N.W.2d 418 (Ct. App. 1983).

¶ 10. Wisconsin Stat. § 218.0172 provides in pertinent part:

(1) Definitions. In this section:

(a) "Adjustment program" means an extended policy program under which a manufacturer undertakes to pay for all or any part of the cost of repairing, or to reimburse purchasers for all or any part of the cost of repairing, any condition that may substantially affect motor vehicle durability, reliability or performance. "Adjustment program" does not include service provided under a written warranty provided to a consumer, service provided under a safety or emission-related recall program or individual adjustments made by a manufacturer on a case-by-case basis.

555

. . . .

**(2)** DISCLOSURE REQUIREMENTS. (a) A manufacturer shall do all of the following:

1. Establish a procedure to inform a consumer of any adjustment program applicable to the consumer's motor vehicle and, upon request, furnish the consumer with any document issued by the manufacturer relating to any adjustment program.

2. Notify, by 1st class mail, a consumer who is eligible under an adjustment program of the condition in the motor vehicle that is covered by the adjustment program and the principal terms and conditions of the adjustment program within 90 days after the date on which the adjustment program is adopted.

3. Notify its motor vehicle dealers, in writing, of all the terms and conditions of an adjustment program within 30 days after the date on which the program is adopted.

4. If a consumer is a purchaser or lessor of a new motor vehicle, notify the consumer, in writing, of the consumer's rights and remedies under this section. The notice shall include a statement in substantially the following language: "Sometimes . . . . (manufacturer's name) offers a special adjustment program to pay all or part of the cost of certain repairs beyond the terms of the warranty. Check with your motor vehicle dealer to determine whether any adjustment program is applicable to your motor vehicle."

. . . .

**(3)** ADJUSTMENT PROGRAM REIMBURSEMENT. (a) A manufacturer who establishes an adjustment program shall implement procedures to assure reimbursement of each consumer eligible under an adjustment program who incurs expenses for repair of a condition subject to

556

the program before acquiring knowledge of the program. Reimbursement shall be consistent with the terms and conditions of the particular adjustment program.

. . . .

**(4)** REMEDIES. In addition to pursuing any other remedy, a consumer may bring an action to recover damages caused by a violation of this section. A court shall award a consumer who prevails in such an action twice the amount of any pecuniary loss, together with costs, disbursements and reasonable attorney fees, notwithstanding s. 814.04 (1), and any equitable relief the court determines appropriate.

¶ 11. Thus, the first question is whether Ford's upgrade kit constitutes an "adjustment program" as that term is defined in the statute. In analyzing the statute, we apply rules of statutory construction. Our analysis begins with an examination of the plain language of the statute, with the goal to give effect to the legislature's intent. *State v. Cardenas-Hernandez*, 219 Wis. 2d 516, 538, 579 N.W.2d 678 (1998). If the plain language is unambiguous, we apply the ordinary meaning of the statutory language to the facts before us. *Id.* When a statute is ambiguous, a reviewing court will look to "the scope, subject matter, and object of the statute to discern the legislative intent," but "must interpret the statute in such a way as to avoid an absurd or unreasonable result." *DeMars v. LaPour*, 123 Wis. 2d 366, 370, 366 N.W.2d 891 (1985). The language of a statute is ambiguous if it is capable of being understood by reasonably well-informed persons in either of two or more ways. *See In re D.S.*, 142 Wis. 2d 129, 134, 416 N.W.2d 292 (1987). "A statute should be construed so that no word or clause shall be rendered

557

surplusage and every word if possible should be given effect." *Donaldson v. State*, 93 Wis. 2d 306, 315, 286 N.W.2d 817 (1980).

¶ 12. We start with the plain meaning of the language of the statute. An adjustment program is defined in the statute as:

(1) an extended policy program;

(2) that the manufacturer undertakes to pay for all or part of the cost of;

(3) repairing a condition;

(4) that may substantially affect the vehicle's durability, reliability or performance; and

(5) it does not apply to regular warranty service, or a safety recall or an emission-related recall program.

*See* WIS. STAT. § 812.0172.

¶ 13. We address each in turn. Question 1: Is the Ford upgrade kit an *extended policy program?* In order to answer that question, we review the chronology preceding the development of the program. Although the date is not entirely clear from the record, sometime before the fall of 2001, Ford began discussing with the Arizona attorney general the issue of the propensity for fires following rear-end collisions resulting from the design and location of the fuel tanks in Panther Platform vehicles. On October 22, 2001, Ford published TSB 01–21–14. TSB 01–21–14 covered *all* 1992–2001 Ford Crown Victorias, Lincoln Town Cars and Mercury Grand Marquis and provided a "Service Procedure to further reduce the unlikely possibility of a fuel tank puncture during an extremely high-speed rear impact in certain vehicle applications." TSB 01–21–14 provided a modification of certain components in the crash to

prevent fuel tank punctures. Ford notified police departments through LAWNET and conferences about TSB 01–21–14. Civilians driving the Panther Platform vehicles, either as original or secondary purchasers, were not notified of TSB 01–21–14.

¶ 14. Prompted by TSB 01–21–14 and consumer complaints, the National Highway Traffic Safety Administration ("NHTSA") opened an investigation on November 27, 2001. The subject of the investigation was "Fuel Tank Integrity in Rear Collisions" in 1992–2001 Ford Panther Platform vehicles. The problem description was: "The fuel tank can rupture following a high-energy rear-end collision resulting in severe fires. A vehicle occupant surviving the impact trauma could be killed as a result of fire intrusion into the passenger compartment."

¶ 15. The NHTSA closed the investigation after concluding that "it is unlikely that further investigation would produce sufficient evidence to demonstrate the existence of a safety-related defect in the subject vehicles." At about the same time, Ford replaced TSB 01–21–14 with the "optional upgrade program," which would be provided free of charge and available only to the CVPI vehicles currently being used in law enforcement. The reason given for the upgrade program was to "reduce the risk that high-speed rear impacts will cause fuel tank punctures." Ford's counsel referred to the upgrade program as "a voluntary program that Ford entered into in conjunction with the Arizona Attorney General's office to work with the police officers there . . . to make this vehicle even safer than it already was."

¶ 16. Having set forth that chronology, we return to our original question, is the "upgrade program" an

"extended policy program"? There is no reasonable way to answer that question negatively. If this upgrade program is not an extended policy program, then what is it? Based on the facts presented, we conclude that Ford's "program" is an "extended policy program" and therefore satisfies the first "element" of the statutory term "adjustment program."

¶ 17. Question 2: Is the manufacturer undertaking to pay for all or part of the cost? Clearly, the answer to this question is yes—Ford is agreeing to provide the upgrade program at no cost to all eligible CVPIs.

¶ 18. Question 3: Does the program repair a condition? Again, the program purports to repair the condition on the Panther Platform vehicles relating to the fuel tank integrity in rear collisions. This constitutes "repairing a condition."

¶ 19. Question 4: Is the condition one that *may substantially* affect the vehicle's durability, reliability *or* performance? We note before answering this question that those three terms are used in the disjunctive—that is, the condition need only affect one and not all three. This portion of the statutory language drew much discussion during oral argument before this court. The question arose as to whether the fuel tank integrity of these vehicles was solely a safety issue or whether it also could fall under durability or performance. All parties conceded that safety and durability are not mutually exclusive, but may overlap. The record also reflects that the original TSB 01–21–14 did not present the condition as one of safety, but rather referenced the repair as "body" and "fuel" parts performance. We conclude that based on the undisputed facts, the upgrade program addresses a condition that may affect the vehicle's durability and performance. It may affect how

560

durable the vehicle is during a rear-end collision and it may affect how well the vehicle "performs" during an accident.

¶ 20. Question 5: Exclusions. The last element of the definition of adjustment program excludes any programs which are covered by a written warranty or safety or emission recall programs. Ford's "upgrade program" is not covered by either. There is no written warranty provided to a consumer covering the upgrade, nor are there any safety recalls or emission recalls related to the condition at issue here. In fact, Ford emphasized that the condition was not such that a safety recall was warranted.

¶ 21. Based on this analysis, we conclude that Ford's "upgrade program" does constitute an "adjustment program" as that term is used in the statute. The trial court erred in concluding otherwise. The trial court's error was based in part on its conclusion that the upgrade program did not repair a "defect." The trial court mistakenly believed that repair of a *defect* was required to state a claim under the MVAPA. As noted above, such requirement is not found within the plain language of the statute. Rather, the statutory language requires the repair of a "condition," which can necessarily *include* a *defective* condition, but does not require the converse—that the condition at issue constitutes a defect.

¶ 22. Moreover, the trial court further supported its decision to grant judgment to Ford based on the failure of Cuellar to demonstrate a pecuniary loss.[11]

---

[11] Ford also argued that Cuellar did not have standing based on the failure to establish the existence of any pecuniary loss. As

Again, the trial court was mistaken in its belief that the statute requires a showing that pecuniary loss be incurred in order to maintain a claim. Cuellar argues that this action was brought not necessarily as a result of a pecuniary loss, but because Ford violated the notice requirements of the statute. Cuellar seeks first and foremost an order that Ford comply with the notice requirements of the statute. Counsel for appellants pointed out during oral argument that Ford refuses to provide the upgrade kit to the appellants and others similarly situated even if they pay for the repair because the upgrade is applicable *only* to CVPIs being used by law enforcement agencies. In addition, the plain language of the statute provides that the court "shall award . . . any equitable relief the court determines appropriate."

¶ 23. The proper remedy in this case is not for this court to decide. Whether the class has suffered any pecuniary loss, whether Ford truly would refuse to sell the upgrade kit to the class members, or whether any other equitable relief is appropriate all present issues of fact, which need to be decided by a factfinder after discovery has been completed. Accordingly, we reverse the summary judgment and remand for further proceedings pertinent to the damage issue.

■

¶ 24. We briefly address two other issues raised in this case. First, Ford argued (and the trial court accepted the argument) that because of the nature of police work—that squads are often stopped on the

noted in the body of this opinion, we reject such contention. The plain language of the statute does not require, in all instances, a pecuniary loss. Accordingly, the trial court's determination that Cuellar did not have standing because he did not suffer any pecuniary loss was erroneous.

freeway and therefore subject to high-speed rear-end collisions—that the CVPIs are at an exponentially greater risk than civilian-model vehicles. Ford argued (and the trial court accepted the argument) that because of this fact, Ford is justified in offering the upgrade only to the police vehicles. Distinctions for different uses of vehicles, however, is not located anywhere in the motor vehicle adjustment program. The statute does not separate certain groups of users driving the same vehicle for special treatment. In fact, the statute was enacted to eliminate exactly what happened here—a secret warranty being offered only to a particular group, here, law enforcement vehicles, despite the fact that all of the Panther Platform vehicles suffer from the same condition being offered for repair.[12]

¶ 25. Second, Ford claims that Cuellar's claim is preempted by the federal Motor Vehicle Safety Act, 49 U.S.C. § 30101. Ford argues that Cuellar is seeking a safety recall of all the Panther Platform vehicles and that safety recalls are within the exclusive authority of the NHTSA. We are not convinced that Cuellar's claim is preempted by federal law. "A fundamental principle of

_____

[12] Ford cites for support a May 3, 1991 letter written by then Wisconsin Attorney General James Doyle, in response to a Wisconsin state senator during the time the legislature was working on enacting the MVAPA. Doyle used the term "motor vehicle defect" in discussing Doyle's knowledge and background of vehicle adjustment programs. Ford relies on Doyle's use of the term "defect" to mean that WIS. STAT. § 218.0172 requires a defective condition before a consumer may have a claim under the statute. This court is not convinced that Doyle's reference in a letter discussing "secret warranties" results in such a conclusion. The legislature enacted the statute without using the term "defect"; rather, it elected to use the term "condition."

the Constitution is that Congress has the power to preempt state law." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citation omitted). Federal preemption, however, was not intended "to supplant state law," *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995), and will operate to preempt all state claims only if the federal law completely occupies the entire field, *see Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992); *Burgo v. Volkswagon of Am.*, 183 F. Supp. 2d 683 (D.N.J. 2001).

¶ 26. Here, the "field" at issue, which Ford argues preempts Cuellar's claim, involves the Motor Vehicle Safety Act. The federal law, however, explicitly states that claims under the MVAPA are saved from preemption. *See* 49 U.S.C. § 30103(d) (safety act does not affect warranty obligations under state law). Ford bases its preemption argument on the premise that Cuellar is attempting to obtain a safety recall through this court system. As Cuellar concedes in its reply brief, "no recall relief is sought in this case." Rather, Cuellar seeks Ford's compliance with its obligations under the MVAPA and damages. Under these circumstances, we conclude that Cuellar's claim is not preempted by federal law.

¶ 27. Finally, this court is mindful of Ford's argument that allowing consumers and the judicial system to "define (or challenge) the parameters of manufacturers' customer satisfaction and adjustment programs . . . would chill automobile manufacturers' development of such programs in the future." This court commends Ford for offering a program which repairs a condition affecting the integrity of the fuel system in rear-end collisions. Its attempt to limit this adjustment program

564

only to police vehicles, however, conflicts with the plain language of the MVAPA, which was enacted by the legislature in this state. Therefore, Wisconsin consumers have the right to seek redress from the Wisconsin judicial system when a manufacturer violates a statute enacted by the legislature. Whether such process results in a "chilling effect" cannot control the decision of this court.

¶ 28. Based on the foregoing, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

*By the Court.*—Judgment reversed and cause remanded with directions.