MADCAP I, LLC,
Plaintiff-Appellant,

v.

Brad McNamee and Bernie J. McNamee
d/b/a Warehouse Rack & Shelf,
Defendants-Respondents,

Midwest Rack Manufacturing, Inc.
and Mike Sabados,
Defendants.

Court of Appeals

*No. 2004AP2045. Submitted on briefs January 13, 2005.
—Decided June 2, 2005.*

2005 WI App 173

(Also reported in 702 N.W.2d 16.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Earl H. Munson, Boardman, Suhr, Curry & Field LLP*, Madison.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Patrick C. Henneger, Hayes, Van Camp & Schwartz, S.C.*, Madison.

Before Deininger, P.J., Vergeront and Lundsten, JJ.

¶ 1. VERGERONT, J. This appeal concerns claims of breach of contract and violation of Wis. Stat. § 100.18[1] that arose out of the efforts of MADCAP I, LLC to purchase storage racks for its warehouse business. MADCAP contends the circuit court erred in dismissing both claims on summary judgment. We conclude MADCAP is entitled to a trial on the breach of contract claim because there are genuine issues of material fact regarding the existence of a contract between MADCAP and Warehouse Rack & Shelf (Warehouse Rack). With respect to the claim under § 100.18, we conclude there are genuine issues of material fact on all the elements of the claim, including the element that MADCAP must "suffer[] pecuniary loss because of a violation of this section." Section 100.18(11)(b)2. Therefore, MADCAP is entitled to a trial on the § 100.18 claim as well. Accordingly, we reverse the circuit court.

## GENERAL BACKGROUND

¶ 2. In the summer of 2002, MADCAP was in the market to purchase warehouse storage racks for its refrigerated warehouse facilities in DeForest, Wisconsin. Dennis Hahn, one of the members of MADCAP, researched Midwestern companies that could provide the racks. He identified Warehouse Rack through its website as a potential supplier. Hahn contacted Warehouse Rack to obtain a price quotation for drive-in racks. He spoke to Brad McNamee, an employee of Bernie McNamee, who was doing business as Warehouse Rack. Warehouse Rack is a division of McNamee

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

and Associates with principal offices located in Lake St. Louis, Missouri. There followed written and oral communications concerning the racks, the details of which are disputed by the parties. It is not disputed that Brad McNamee contacted Midwest Rack Manufacturing, Inc. (Midwest) to provide used racks to MADCAP.

¶ 3. Ultimately the racks were not installed at MADCAP's warehouse, and the reasons for that are in dispute. According to MADCAP, the racks delivered were of an inferior quality compared to those that had been shown to Hahn, and the installers did not perform their job. According to Warehouse Rack, the racks delivered to MADCAP were the same used racks that Hahn had inspected and it was MADCAP's fault that the installers did not perform their job.

¶ 4. MADCAP filed this action against the McNamees (to whom we will refer as Warehouse Rack), Midwest and its owner, Michael Sabados. The complaint alleged a breach of contract claim against all defendants and a violation of WIS. STAT. § 100.18 against Warehouse Rack.[2] Warehouse Rack filed an answer and a counterclaim for breach of contract.

¶ 5. Warehouse Rack moved for summary judgment on all claims against it and the circuit court granted the motion. As for the breach of contract claim, the court concluded that, based on the undisputed facts, MADCAP's contract was with Midwest, not with Warehouse Rack. As for the claim under WIS. STAT. § 100.18, the court decided there was no evidence of a misrepresentation within the meaning of that statute because the challenged website statements were merely puff-

---

[2] In addition, the complaint alleged a claim of fraud in the inducement against Warehouse Rack and fraud in the performance against all defendants. The court dismissed both these claims against Warehouse Rack on its motion for summary judgment, and MADCAP is not pursuing these claims on appeal.

ery.[3] Alternatively, the court stated, there was no evidence that any statement on the website caused MADCAP's damages.

## ANALYSIS

¶ 6. MADCAP contends on appeal that the circuit court erred in concluding there was no evidence showing that MADCAP had a contract with Warehouse Rack. Regarding its Wis. Stat. § 100.18 claim, MADCAP contends the website made "representations" within the meaning of § 100.18 and there is evidence showing MADCAP suffered pecuniary loss because the representations were false or misleading.

¶ 7. A party is entitled to summary judgment if there are no genuine issues of material fact and that party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2). In reviewing the grant or denial of a summary judgment, we employ the same methodology as the circuit court and our review is de novo. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). The moving party is entitled to summary judgment if there are no genuine issues of material fact and that party is entitled to judgment as a matter of law. Section 802.08(2). In deciding whether there are genuine issues of material fact, we view the evidence most favorably to the non-moving party, drawing all reasonable inferences from the evidence in that

---

[3] Warehouse Rack does not contend on appeal that the statements or representations at issue are puffery. Accordingly, we do not address MADCAP's argument that the circuit court erred in concluding they were puffery. We take Warehouse Rack's failure to respond to this argument as a concession that the representations are not puffery.

779

party's favor. *Grams v. Boss*, 97 Wis. 2d 332, 339, 294 N.W.2d 473 (1980). Whether an inference is reasonable and whether particular evidence permits more than one reasonable inference are both questions of law, which we review de novo. *Hennekens v. Hoerl*, 160 Wis. 2d 144, 162, 465 N.W.2d 812 (1991).

## I. Breach of Contract Claim

¶ 8. Both parties agree that this transaction is subject to WIS. STAT. ch. 402, "Uniform Commercial Code—Sales," but that the principles of contract law may also apply to determine if there was a contract between MADCAP and Warehouse Rack.[4] A contract is formed when there is an offer, an acceptance and consideration. *Gustafson v. Physicians Ins. Co. of Wisconsin, Inc.*, 223 Wis. 2d 164, 173, 588 N.W.2d 363 (Ct. App. 1998). An offer is a " 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.' " *Malone v. Fons*, 217 Wis. 2d 746, 768-69, 580 N.W.2d 697 (Ct. App. 1998) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24

---

[4] MADCAP makes a brief alternative argument under WIS. STAT. § 402.201(2). MADCAP contends there was a contract "as a matter of law or it is a jury issue" with Warehouse Rack because Warehouse Rack did not give a written notice of objection to the August 22 acceptance. To the extent MADCAP is arguing here that it is entitled to judgment as a matter of law that it had a contract with Warehouse Rack, the argument is not sufficiently developed for us to decide. To the extent MADCAP is arguing that there are disputed issues of fact under this alternative theory, it is unnecessary for us to address this alternative theory because of our conclusion that there are material factual issues under common law contract principles.

(1979)). Mutual promises for future performances of acts by the parties may be consideration if each of the promises is capable of being performed, are given in exchange for each other, and are mutually binding upon the parties. *Stack v. Roth Bros. Co.*, 162 Wis. 281, 287–88, 156 N.W. 148 (1916).

¶ 9. MADCAP contends there is evidence on each of the three elements that shows a contract between it and Warehouse Rack. Warehouse Rack responds that there is no evidence that Warehouse Rack offered to sell, deliver, or install the racks and no evidence of consideration. Warehouse Rack relies on Brad McNamee's affidavit and the affidavit of Sabados to argue that they told Hahn that Midwest, not Warehouse Rack, would be selling and installing the racks and Hahn therefore knew the contract was with Midwest, not Warehouse Rack. Because we are to view the evidence most favorably to MADCAP, we focus on Hahn's affidavit rather than the submissions relied on by Warehouse Rack.

A. Evidentiary Submissions

¶ 10. Hahn avers that, after talking by phone with Brad McNamee on July 30, 2002, he sent a fax as requested that stated the requirements of the racks MADCAP needed. Brad McNamee called that day or the next to tell Hahn that they were disassembling a Sturdi-Bilt storage rack at a warehouse in Waukesha, Wisconsin. MADCAP received a faxed document from "McNamee," dated July 31, on Warehouse Rack letterhead with a price per pallet for the used Sturdi-Bilt racks, the layout MADCAP needed based on its fax, and the installation cost per pallet. Hahn went to the Waukesha warehouse on August 6, 2002, and inspected the Sturdi-Bilt racks that were in the warehouse. He met Sabados at that time, but was not told that

781

Midwest would sell and deliver the racks and would contract with an outside installer for the installation. Hahn did not negotiate price or quantity with Sabados and Sabados did not indicate to him that a purchase order should be issued to Midwest only. Hahn did tell Sabados that MADCAP needed more "cant legs," and Sabados said he would manufacture the additional cant legs.

¶ 11. On August 19, 2002, Hahn received another faxed document from "McNamee," again on Warehouse Rack letterhead, titled "P.O. Verbal Dennis Hahn."[5] This document contained the same quantity and pricing as the July 31 document, except that the cost of the cant legs and the freight cost was added. In addition, this document stated: "Terms: 30% at first truck load, 30% after final truck, remainder immediately after install" and instructed: "Make Purchase Order To: Midwest Steel [sic], 905 Fairway Pk. Dr., Madison, IL . . . Please send 30% deposit after 1st truck load, made out to Midwest Steel [sic][6] in the amount of $14,000." The "approx. lead time" was "Mid September or sooner." Hahn wrote to both "Brad McNamee, Warehouse Rack & Shelf" and "Mike Sabados, Mid-West Rack Mgf., Inc." in one letter dated August 22, 2002, stating that MADCAP accepted "your proposal" of August 19, 2002, and that MADCAP expected to be ready for installation by September 16.

¶ 12. According to Hahn's affidavit, he was never told that Warehouse Rack was not a party to the contract; he believed MADCAP was buying the racks

---

[5] By "titled," we mean that "P.O. Verbal Dennis Hahn" is the first writing under the name and address of Warehouse Rack and it is in bold.

[6] The parties appear to agree that "Midwest Steel" was mistakenly written for "Midwest Rack Manufacturing, Inc."

from Warehouse Rack and that Sabados and Midwest represented the manufacturer of the used product, with Midwest being an agent or joint partner with Warehouse Rack. There is no evidence that MADCAP made a purchase order to Midwest, other than the August 22 acceptance letter to both Warehouse Rack and Midwest.[7]

¶ 13. MADCAP made the first payment of $14,000 on or about September 17, 2002, by check to Warehouse Rack and Midwest.[8] When Sabados asked that the next check be made out to him personally so that he could pay the installers, Hahn wrote Sabados that, because the contract was with Warehouse Rack and Midwest, MADCAP would need authorization from both those entities in writing before it would do that.

---

[7] According to Brad McNamee's affidavit, when he received the August 22 letter he contacted Hahn and told him that under the terms of the quotation, all purchase orders had to be "made out only to the seller, Midwest"; Hahn "acknowledged his mistake and indicated . . . that a new purchase order would be made out to Midwest only." In his affidavit, Hahn denies Brad McNamee told him that Warehouse Rack was not a party and denies he ever acknowledged that he made a mistake in his August 22 acceptance letter. "At some point," Hahn avers, "Brad McNamee asked me to issue a purchase order to Midwest Rack, but I did not understand why he made that request." There is clearly a dispute over the nature of the conversation between Brad McNamee and Hahn about a purchase order to Midwest, but neither party states whether MADCAP ever made a purchase order to Midwest after the August 22 letter. It is reasonable to infer from both affidavits and from the lack in the record of a purchase order to Midwest that MADCAP did not make a purchase order to Midwest after its August 22 letter. That is therefore the inference we draw for purposes of the appeal.

[8] MADCAP alleged this in the complaint and Warehouse Rack admitted this in its answer, also stating that it signed the check over to Midwest.

After receiving both those authorizations, MADCAP did issue a check for $13,000 to Sabados personally. When Hahn learned on September 25, 2002, that the installers had left the job and checked out of the hotel and that the check to Sabados had been cashed, Hahn called Brad McNamee. The two had a number of telephone conversations about how missing rack parts could be obtained and the installation could be completed. Brad McNamee demanded a check for $6500 before ordering the missing parts; MADCAP sent the check to Brad McNamee, but then stopped payment on the ground that it was in excess of the contract price for materials.

B. Offer

¶ 14. MADCAP contends that Hahn's affidavits and the attached documents are evidence that Warehouse Rack made an offer on August 19, which MADCAP accepted on August 22, and that the mutual promises, as well as MADCAP's subsequent payments, were consideration. Warehouse Rack responds that the August 19 document was not an offer from it, but was simply a price quotation, which invited an offer from MADCAP to Midwest by the direction to "Make a Purchase Order to: Midwest Steel [sic]." Warehouse Rack also contends that Hahn's actions taken after August 22—two faxes to Sabados on details for the installation and one about a price adjustment because of a layout change—show that Hahn understood the contract was with Midwest, not with Warehouse Rack.

¶ 15. Warehouse Rack relies on RESTATEMENT (SECOND) OF CONTRACTS § 26 (1979), which provides that "a manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." Warehouse Rack finds

particular support in comment c to that section, quoting this portion: "the word 'quote' is commonly understood as inviting an offer rather than as making one, even when directed to a particular customer." However, the entire comment c makes clear that a quote may be an offer, depending on the contents and the circumstances:

> c. *Quotation of price.* A "quotation" of price is usually a statement of price per unit of quantity; it may omit the quantity to be sold, time and place of delivery, terms of payment, and other terms. It is sometimes associated with a price list or circular, but the word "quote" is commonly understood as inviting an offer rather than as making one, even when directed to a particular customer. But just as the word "offer" does not necessarily mean that an offer is intended, so the word "quote" may be used in an offer. In determining whether an offer is made relevant factors include the terms of any previous inquiry, the completeness of the terms of the suggested bargain, and the number of persons to whom a communication is addressed.

*Id.* cmt. c. This is consistent with Wisconsin case law. *See Nickel v. Theresa Farmers Coop. Ass'n.*, 247 Wis. 412, 415–17, 20 N.W.2d 117 (1945) (whether communication naming price is quotation or offer depends on the intention of the owner as manifested by the facts and circumstances of each case). Thus, the critical question in the context of this summary judgment review is not whether the August 19 document can be called a "quote" but whether it can reasonably be considered an offer by Warehouse Rack, given its contents and the relevant circumstances here.

¶ 16. Viewing the evidence most favorably to MADCAP, we conclude it is reasonable to infer that the August 19 document was an offer from Warehouse Rack and Midwest to MADCAP. The document contains more

than a price quotation: it contains quantity, lay out, total cost, payment terms, and approximate delivery time. Indeed, in its answer Warehouse Rack admitted that "on or about July 31, 2002, the McNamee Defendants proposed to sell to MADCAP certain used, heavy-duty Sturdi-Bilt Drive-In Racks . . . then located in Waukesha, Wisconsin." Warehouse Rack's argument that the August 19 document was not an offer from Warehouse Rack appears, then, to rest entirely on the instruction to make a purchase order to Midwest and to make the first payment to Midwest, and not on any lack of specificity in the document concerning the terms.

¶ 17. While the August 19 document, viewed in isolation, might reasonably be construed as inviting an offer by means of a purchase order to Midwest, that is not the only reasonable construction. The document is titled "P.O. Verbal Dennis Hahn." Because Hahn, according to his affidavit, had discussed price and quantity only with Brad McNamee, not with Sabados, it is reasonable to infer that the oral purchase order referred to an oral purchase order to Warehouse Rack. Although the document instructs MADCAP to make a purchase order to Midwest, the document does not say "only" to Midwest, and it directs the first payment, but not subsequent ones, to be sent to Midwest; thus the document does not plainly tell MADCAP that Warehouse Rack is no longer making an offer to sell the very same products at the same price (with some additional costs) that were the subject of the July 31 document from Warehouse Rack. A reasonable person could infer that the August 19 document—on Warehouse Rack letterhead and sent by "McNamee"—is an offer to enter into an agreement with both Warehouse Rack and Midwest for the products and on the terms specified.

786

¶ 18. The evidence of the conduct of Hahn and Warehouse Rack after August 19, viewed most favorably to MADCAP, is consistent with an understanding that MADCAP was accepting an offer from both Warehouse Rack and Midwest: MADCAP's August 22 acceptance to both; the first check made out to both; Hahn's insistence on authorization from both for the second check; the delivery of the racks without a purchase order ever being sent to Midwest; and Hahn's dealings with Brad McNamee after the installers stopped work. Hahn's communications with Sabados on which Warehouse Rack relies are not necessarily inconsistent with Warehouse Rack being a party to the contract with MADCAP. Even if they are, the inconsistency is a factual dispute that cannot be resolved on summary judgment.

C. Consideration

¶ 19. Warehouse Rack's argument that there is no consideration has two grounds: there were no mutual promises for future performance and the money MADCAP paid went to Midwest, not Warehouse Rack. The first ground rests on essentially the same contention we have just rejected—that the August 19 document unambiguously directs MADCAP to enter into a contract with Midwest and shows no intent by Warehouse Rack to make an offer or have any obligations to MADCAP. For the reasons we have explained above, we conclude the August 19 document, in the context of the other evidence we have discussed, gives rise to a reasonable inference that Warehouse Rack was promising to deliver the racks described on the terms described if MADCAP accepted the offer. MADCAP's August 22 acceptance letter expressed its promise of future performance—to pay the amounts

787

specified upon the terms specified. Thus, there is evidence of mutual promises between MADCAP and Warehouse Rack that constitute consideration between those two parties.

¶ 20. Although the evidence of mutual promises suffices to entitle MADCAP to a trial on the element of consideration, we choose to address Warehouse Rack's second contention: because the money MADCAP paid went to Midwest, not Warehouse Rack, it is not consideration for a contract between MADCAP and Warehouse Rack. Warehouse Rack stated in its answer that it signed the first check, made out to both Warehouse Rack and Midwest, over to Midwest. There is no evidentiary submission meeting the requirements of WIS. STAT. § 802.08(3) that so states, but we will assume for purposes of argument that is true. It is undisputed that Warehouse Rack authorized the second check to be paid to Sabados personally. However, if Warehouse Rack had the right to receive those payments from MADCAP, the fact that it signed one over to a third party and directed the other to be paid to a third party does not eliminate those payments as consideration between Warehouse Rack and MADCAP. *See* RESTATEMENT (SECOND) OF CONTRACTS § 71(4) cmt. e (1981). It is reasonable to infer from the evidence, viewed most favorably to MADCAP, that Warehouse Rack had the right to receive at least some portion of the two checks that MADCAP paid.

II. WISCONSIN STAT. § 100.18

¶ 21. WISCONSIN STAT. § 100.18 provides in part:

**Fraudulent representations. (1)** No person, firm, corporation or association, or agent or employee thereof ... with intent to induce the public in any

788

manner to enter into any contract or obligation relating to the purchase ... of any ... merchandise ... or service, shall ... publish ... an advertisement, announcement, statement or representation of any kind to the public relating to such purchase ... of such ... merchandise [or] service ... or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

. . . .

**(11)** (b) 2. Any person suffering pecuniary loss because of a violation of this section by any other person may sue in any court of competent jurisdiction and shall recover such pecuniary loss, together with costs, including reasonable attorney fees . . . .

¶ 22. The elements of a claim under this statute, as most recently stated by the supreme court, are: (1) the defendant made to the public an "advertisement, announcement, statement or representation" relating to the purchase of merchandise or services or to the terms or conditions thereof; (2) the defendant's intent was to induce the public to enter into a contract or obligation for the merchandise or services; (3) the "advertisement, announcement, statement or representation" was "untrue, deceptive or misleading," and (4) the plaintiff sustained a pecuniary loss because of the "advertisement, announcement, statement or representation." *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 39, 270 Wis. 2d 146, 677 N.W.2d 233 (citing to WIS. STAT. § 100.18 and to WIS JI—CIVIL 2418).

789

¶ 23. MADCAP contends there is evidence entitling it to a trial on each of the elements of the claim. Specifically, MADCAP contends the submissions show that: (1) Warehouse Rack's website made statements representing that it was a large, experienced business engaged in the manufacture, design, and installation of new and used racks; (2) it made these representations to induce the public to enter into contracts with it to purchase racks and services from it; (3) Warehouse Rack's own submissions show these are untrue; and (4) the damages from the defective racks and inadequate installation services were caused by the representations because MADCAP would not have entered into the contract with Warehouse Rack had it known the true size and nature of the business.

¶ 24. Warehouse Rack responds that the nondisclosure of facts about Warehouse Rack's size and the nature of its business is not a "representation" within the meaning of the statute, and it disputes MADCAP's interpretation of statements on its website. In addition, Warehouse Rack argues that the representations MADCAP identifies were not a material inducement and any pecuniary loss MADCAP sustained was not caused by the representations. These last two arguments relate to the fourth element of the claim.[9]

---

[9] We recognize that the representations that are the subject of this dispute do not concern features of a product but, rather, the manner in which the business provides the products and services it advertises (that is, from its own inventory and through its own employees rather than by matching buyers and sellers for a commission). Warehouse Rack does not argue that such representations are beyond the scope of Wis. Stat. § 100.18(1), thus implicitly conceding that they are within the statute's scope. Section 100.18(1) covers represen-

A. Evidentiary Submissions

¶ 25. The contents of Warehouse Rack's website are not disputed for purposes of this appeal. In his affidavit, Hahn avers that his impression from the website was that Warehouse Rack was representing itself to be "a large, experienced business engaged in the manufacture, design and installation of new and used racks." Hahn refers to the following specific statements as examples: (1) "Rack Design & Layout"; (2) "Local Mfg," which, Hahn avers, he thought meant "Manufacturer"; (3) "Our Corporate offices and primary distribution is out of our three warehouses in St. Louis, Mo. Although, we have shipping locations in Chicago, California, Texas, North Carolina and Pennsylvania"; (4) "We stock locally manufactured new and used pallet rack . . ."; (5) "[W]e promise you solid engineering, quality manufacturing and on-time delivery;" (6) "We provide experienced and professional rack installation"; and (7) "Our installers are real professionals that take pride in providing a quick thorough installation." Hahn candidly states in his affidavit: "I cannot say I read all the above statements, but my review of the website . . . convinced me that Warehouse Rack was a large, sophisticated, multidimensional business."

¶ 26. Hahn further avers that, after the "defendants abandoned the job," he filed a complaint with the Wisconsin Division of Trade and Consumer Protection, Department of Agriculture, and Brad McNamee's response to the complaint stated: "We are [a] small op-

_____

tations "relating to such purchase . . . of such . . . merchandise [or] service . . . or to the terms or conditions thereof." This language is broad enough to include the representations at issue in this case, and we have discovered no case law that might arguably support an argument to the contrary.

eration (3 people operating out of my home for [the] last 19 years)." In his affidavit, Brad McNamee avers that Warehouse Rack "is a sales group that matches buyer and seller together for a commission or fee paid by the seller." Neither of the McNamees told him these facts about their business, Hahn avers. Had they told him of "the size and nature of their business," MADCAP would not have signed a contract with them.

¶ 27. As a result of the conduct of Warehouse Rack and Midwest, Hahn avers, MADCAP was required to purchase additional racks and parts and hire others to assemble and install the racks, after having already paid $27,000; in addition, the poor quality and defects of some of the racks delivered caused MADCAP further damage.

B. False or Misleading Representations Made to Induce

¶ 28. We consider first Warehouse Rack's argument that the failure of Warehouse Rack to disclose to MADCAP that it consisted of three persons operating from their home who matched buyers with sellers for a commission does not constitute a representation under *Tietsworth*, 270 Wis. 2d 146. In *Tietsworth*, the court held that Wis. Stat. § 100.18(1) does "not purport to impose a duty to disclose, but, rather, prohibits only affirmative assertions, representations, or statements of fact that are false, deceptive, or misleading." *Id.*, ¶ 40. The court therefore concluded that a failure to disclose a motorcycle engine defect did not constitute a "representation" or "statement" within the meaning of the statute.

¶ 29. We do not agree with Warehouse Rack that MADCAP is asserting that Warehouse Rack's failure to disclose constitutes the actionable misrepresentation.

Rather, the evidence of the actual size and nature of Warehouse Rack's business is evidence, according to MADCAP, that the website's affirmative representations are false.

¶ 30. Warehouse Rack also argues that the website does not expressly say that it is "a large, sophisticated multidimensional business." However, construing Hahn's affidavit most favorably to MADCAP, the representations he attributed to Warehouse Rack's website are that Warehouse Rack is a large, experienced business that itself owns, manufactures, designs, and installs new and used racks. If the undisputed statements on the website reasonably convey this meaning, even if there are other reasonable meanings, then the resolution of the meaning of the statements is an issue of fact for the jury. *See Rach v. Kleiber*, 123 Wis. 2d 473, 481, 367 N.W.2d 824 (Ct. App. 1985) (on claims under WIS. STAT. § 100.18 and common law misrepresentation, there were reasonable conflicting inferences about the meaning of "new," making summary judgment improper). We conclude that the statements Hahn lists in his affidavit, as well as a number of others on the website, may be reasonably construed as representing that Warehouse Rack is a large, experienced business that itself owns, manufactures, designs, and installs new and used racks.[10]

---

[10] Some examples are: (1) "[w]e manufacture new drive-in racks and a great supply of used drive-in/drive-through racking, available in stock for immediate delivery"; (2) "All Brands New & Used bought & sold." "Corp. Info.," p. 1; (3) "Warehouse Rack & Shelf, a division of McNamee & Associates, has been supplying quality products and superior service to the Nation's largest original equipment manufacturer's (O.E.M.) and distributors since 1983; (4) "As America's top rack supplier, we promise you solid engineering, quality manufacturing and on-time delivery."

¶ 31. We next conclude it is reasonable to infer that Warehouse Rack made the representations in order to induce the public to purchase the products and services described on its website. This is a reasonable inference because the statements are on the website and because, according to Brad McNamee's affidavit, Warehouse Rack receives a "majority of its leads" from its website.

¶ 32. As for whether the representations (reasonably construed in MADCAP's favor) are false or misleading, Warehouse Rack does not concede they are, but it does not argue there is no evidence showing they are false or misleading. We conclude there is evidence creating a reasonable inference that they are false or misleading: Brad McNamee's affidavit averring that Warehouse Rack's business consists of matching buyers to sellers for a commission and his statement that Warehouse Rack consists of three persons operating out of a home.

C. Representations Causing Pecuniary Damage

¶ 33. Having concluded there is evidence entitling MADCAP to a trial on the first three elements, we turn to the fourth element—that MADCAP suffered a pecuniary loss "because of a violation of

---

"Storage Products," p. 1; (5) "We stock . . . new and used pallet rack . . . ." "Used Rack," pp. 1 and 2; (6) "We have over 10,000 pallet positions of used drive-in pallet rack." "Used Rack," p. 2; (7) "[W]e stock truckloads of used racking . . . in the Midwest for immediate shipment." "Used Rack," p. 3; (8) Warehouse Rack "is a material handling and storage products integrated supplier . . . ." "Services," p. 1; (9) "Warehouse Rack & Shelf has full-time installation crews available to handle installation of your rack system . . . . Our installers can be contracted to meet the rack when it arrives at your dock . . . . Our installers are real professionals . . . ." "Installation Services," p. 1.

[100.18(1)]." The jury instructions define this element as follows: "In determining whether plaintiff's loss was caused by the (assertion) (representation) (statement), the test is whether (*plaintiff*) would have acted in its absence. Although the (assertion) (representation) (statement) need not be the sole or only motivation for (*plaintiff*)'s decision[,] . . . it must have been a material inducement." WIS JI—CIVIL 2418.

¶ 34. Warehouse Rack first contends Hahn's affidavit is insufficient to show that *any* website statement induced MADCAP to contract with Warehouse Rack for two reasons. First, Warehouse Rack points out that Hahn does not aver that he can recall the specific statements he read and, in fact, he acknowledged he cannot. However, Hahn avers he read the website, and we have already concluded that the meaning Hahn avers it conveyed to him—that Warehouse Rack was a large, experienced business engaged in the manufacture, design, and installation of new and used racks—is a reasonable inference from numerous statements on the website.

¶ 35. Second, Warehouse Rack contends there is no evidence MADCAP was induced to contract with it by any statement on the website because Hahn avers only that he "included Warehouse Rack as one of the vendors to contract" based on the website. Reading Hahn's affidavit most favorably to MADCAP, we conclude it creates a reasonable inference that MADCAP decided first to contact Warehouse Rack and then to contract with it because of the message the website conveyed to Hahn about the size and nature of Warehouse Rack's business.[11]

───────────

[11] Warehouse Rack also argues that its website did not induce MADCAP to contract with Midwest. However, we have

¶ 36. Warehouse Rack next contends there is no evidence MADCAP sustained a pecuniary loss *because* of any website representation. In Warehouse Rack's view, the loss MADCAP asserts—defective racks and no installation—was the result of misrepresentations and failings by Sabados, not of representations on the Warehouse Rack website. However, the jury instruction defines the test for determining whether a pecuniary loss was caused by the representation as: "Whether plaintiff would have acted in its absence." Wis. JI—Civil 2418. The representation must be "a material inducement," but it "need not be the sole or only motivation for the plaintiff's decision to act." *Id.* The act referred to in the instruction is the plaintiff's act of making a purchase or entering into a contract. Thus, the causation described is between the misrepresentation and the plaintiff's act. Therefore, even if representations by Sabados were an inducement for MADCAP to enter into the contract, that does not defeat MADCAP's Wis. Stat. § 100.18 claim against Warehouse Rack unless its website representations were not a material inducement to MADCAP. We are satisfied that Hahn's affidavit, viewed most favorably to MADCAP, is evidence that the website representations on the size and nature of Warehouse Rack's business were a material inducement for MADCAP to enter into a contract for the purchase of the racks.

¶ 37. In summary, we conclude there are genuine issues of material fact entitling MADCAP to a trial on

already concluded there are genuine issues of material fact regarding whether MADCAP contracted with Warehouse Rack as well as Midwest.

whether the website representations that Hahn identifies caused MADCAP pecuniary loss.[12]

*By the Court.*—Judgment reversed.

[12] A portion of Warehouse Rack's argument on causation of pecuniary loss appears to rely on a different standard than that contained in WIS JI—CIVIL 2418. For example, Warehouse Rack cites to 22 AM. JUR. 2D *Damages* § 301 (2004) for this proposition. "Damages may be recovered only for injuries that flow directly from, and as the probable and natural result of, a wrong." However, in other portions of its argument Warehouse Rack cites to the jury instruction standard for causation of pecuniary loss and relies on it. Because Warehouse Rack relies on the jury instruction for portions of its argument and does not develop an argument challenging the jury instruction standard as inconsistent with WIS. STAT. 100.18(11)(b), we apply the standard in the jury instruction.