CITY of JANESVILLE, Plaintiff-Respondent,†

v.

CC MIDWEST, INC. a foreign corporation,
Defendant-Appellant.

Court of Appeals

*No. 2004AP267. Oral argument November 22, 2005.
—Decided January 26, 2006.*

2006 WI App 21

(Also reported in 710 N.W.2d 713.)

† Petition to review granted 4-10-06.

455

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Alan Marcuvitz, Andrea H. Roschke,* and *Susan M. Sager,* orally argued by *Alan Marcuvitz* and *Andrea H. Roschke, Michael Best & Friedrich LLP*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was orally argued by and submitted on the briefs of *Mark J. Steichen, Boardman, Suhr, Curry & Field LLP*, Madison.

Before Lundsten, P.J., Vergeront and Higginbotham, JJ.

¶ 1. VERGERONT, J.   The City of Janesville initiated this action for a writ of assistance to remove CC Midwest, Inc., from property the City had acquired by exercising its power of eminent domain. The City also sought a declaration that it had satisfied all its obliga-

tions under WIS. STAT. ch. 32[1] and was therefore entitled to possession. The issue on appeal is whether the circuit court correctly concluded that the City had met its obligation under WIS. STAT. § 32.05(8)(b) and (c) to make available to CC Midwest a comparable replacement property before requiring CC Midwest to vacate. We conclude that, because none of the properties identified by the City met the definition of "comparable replacement business" in WIS. STAT. § 32.19(2)(c), the City was not entitled to the writ. Accordingly, we reverse the circuit court's judgment granting the writ and direct it to enter judgment denying the writ.

## BACKGROUND

¶ 2. The property at issue consists of approximately nine acres located in the City of Janesville. CC Midwest rented the property and operated a trucking terminal there. CC Midwest was a division of a company that was owned by Cen Tra, Inc., and a corporation related to Cen Tra owned the property. CC Midwest is a "less than truckload" operation, meaning that its customers send and receive freight in quantities less than a semi-trailer can carry. Each truck makes as many pickups as it can in the terminal's service area, then returns to the terminal where the freight is unloaded and reloaded into other trucks that deliver to remote terminals in the network, which covers thirty-eight states. The service area of the CC Midwest terminal on the property acquired by the City was South Central Wisconsin. The building on the property included twenty docks arranged in a "cross-docking" configuration, which allowed the trucks that were being un-

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

loaded to be directly across the terminal floor from the doors of the trucks that receive the freight.

¶ 3.　On February 7, 2003, the City acquired the property occupied by CC Midwest as part of a transportation project that involved reconstructing a street and constructing a railroad bridge, underpass, and drive. CC Midwest had been notified of the City's plans in November 2001. In October 2002, the City sent CC Midwest a letter advising that it would need to relocate, would receive a ninety-day advance notice of when it had to move, and would be eligible for specified relocation assistance. The letter also listed several " 'comparable replacement businesses' that [CC Midwest might] wish to consider." On February 6, 2003, the City notified CC Midwest that it would have until May 8, 2003, to vacate the property; there would be no rent due for the thirty-day period commencing February 15, 2003, and the City specified the rent for any other period of occupancy. Later in February the City notified CC Midwest of eight "more possible sites . . . for the relocation of CC Midwest."

¶ 4.　In March 2003, CC Midwest[2] informed the City by letter that none of the suggested sites were comparable:　some were only vacant land; the land and/or the building on some were too small; some of the buildings were warehouses not conducive to cross-docking operations; four sites were too far from Janesville (one over fifty miles, two approximately 100 miles, and one over 125 miles); and one was not for sale. The City's position was that at least three of those sites were "comparable replacement properties." By letter dated April 14, 2003, the City advised CC Midwest that it had

---

[2] The correspondence was from Cen Tra on behalf of CC Midwest.

to physically vacate the property by May 16, 2003. CC Midwest did not vacate the property by May 16. The parties subsequently entered into an occupancy agreement defining the terms under which CC Midwest could occupy the property while the City sought a writ of assistance requiring CC Midwest to vacate the property.

¶ 5. The City initiated this action seeking a declaration that it had complied with its obligations under Wis. Stat. ch. 32 and was entitled to a writ of assistance directing the sheriff to remove CC Midwest from the property. CC Midwest opposed the writ on the ground that the City had not made available a comparable replacement property as required by Wis. Stat. § 32.05(8)(b) and (c) before a condemnor may make an occupant vacate the property. The court treated the City's motion for the issuance of a writ as a motion for summary judgment, and the parties filed briefs and affidavits on the issue whether the City had met its statutory obligation to make available a comparable replacement property. The circuit court concluded that there were no issues of material fact and that the City had met its obligation to make available a comparable replacement property. The court therefore issued a judgment for a writ of assistance.[3]

## ANALYSIS

¶ 6. On appeal CC Midwest contends, as it did in the circuit court, that the City was not entitled to a writ

---

[3] CC Midwest also argued in the circuit court that the granting of the writ would constitute a taking of its property without just compensation in violation of the Fifth Amendment of the United States Constitution and article 1, section 13 of the Wisconsin Constitution. The circuit court rejected this argument and CC Midwest renews it on appeal. We do not address it because of our resolution of the statutory argument.

of assistance because it did not make available a "comparable replacement property" as required by WIS. STAT. § 32.05(8)(b) and (c). CC Midwest asserts that none of the properties the City identified met the definition of "comparable replacement business" in WIS. STAT. § 32.19(2)(c).[4]

¶ 7. The City at oral argument conceded that there is no dispute that the properties it identified did not meet the statutory definition for a comparable replacement business in WIS. STAT. § 32.19(2)(c) at the time it was requiring CC Midwest to vacate the property. However, its position is that the relevant statutory provisions, when read together in light of *City of Racine v. Bassinger*, 163 Wis. 2d 1029, 473 N.W.2d 526 (Ct. App. 1991), and *Dotty Dumpling's Dowry, Ltd. v. Community Development Authority of the City of Madison*, 2002 WI App 200, 257 Wis. 2d 377, 651 N.W.2d 1, require only that it identify property that could be made comparable as defined in § 32.19(2)(c) and offer the payment identified in § 32.19(3) and (4m).[5]

---

[4] CC Midwest also asserts that none of the properties met the definition of "comparable replacement business" in WIS. ADMIN. CODE § COMM 202.01(7), which essentially tracks the statutory definition. WISCONSIN STAT. § 32.26(2)(a) grants the Department of Commerce the authority to promulgate regulations to implement WIS. STAT. § 32.19, and the department has done that in WIS. ADMIN. CODE ch. COMM 202. We do not further discuss these regulations because neither party relies on them in its argument on the proper construction of the statute.

[5] Before holding oral argument, we certified this case to the supreme court and the supreme court did not accept certification. In the certification, we identified the issue as the meaning of "comparable replacement business" in WIS. STAT. § 32.19(2)(c), and we described the definition as ambiguous because of terms such as "reasonably similar" and "functionally equivalent." However, after subsequent supplemental briefing

¶ 8. When we review a summary judgment, we employ the same methodology as the circuit court and our review is de novo. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 317, 401 N.W.2d 816 (1987). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2). Given the competing theories of statutory construction advanced by the parties, we conclude that the material facts are undisputed. The proper construction of a statute when applied to undisputed facts presents a question of law, which this court reviews de novo. *State v. Setagord*, 211 Wis. 2d 397, 405–06, 565 N.W.2d 506 (1997).

¶ 9. When we construe a statute, we start with the language of the statute and give it the common, ordinary, and accepted meaning, except that technical or specially defined words are given their technical or special definitions. *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. We interpret statutory language in the context in which it is used, not in isolation but as part of a whole, in relation to the language of surrounding or closely related statutes, and we interpret it reasonably to avoid absurd or unreasonable results. *Id.*, ¶ 46. We also consider the scope, context, and purpose of the statute insofar as they are ascertainable from the text and structure of the statute itself. *Id.*, ¶ 48. If, employing these principles, statutory language is unambiguous

and oral argument, it has become apparent that the dispute between the parties is not over whether any of the properties identified by the City meet the definition of § 32.19(2)(c).

—that is, there is only one reasonable meaning—then we apply this plain meaning. *Id.*, ¶ 46 (citation omitted). We also consider prior cases construing the statute, because judicial construction becomes part of the statute unless subsequently amended by the legislature. *Wenke v. Gehl Co.*, 2004 WI 103, ¶ 31 n.17, 274 Wis. 2d 220, 682 N.W.2d 405.

¶ 10.   We begin with an analysis of the statutory language at issue and then discuss the cases on which the City relies.

¶ 11.   WISCONSIN STAT. § 32.05 provides the procedure for certain municipalities to follow when condemning land for certain public projects, and the parties agree that this is the applicable section. After describing the procedure for acquiring title and determining the amount of compensation to the property owner, this section addresses the occupants of the property and provides in part:

**Condemnation for sewers and transportation facilities. (8)** OCCUPANCY; WRIT OF ASSISTANCE; WASTE.

. . . .

(b) No person occupying real property may be required to move from a dwelling or move his or her business or farm without at least 90 days' written notice of the intended vacation date from the condemnor. The displaced person shall have rent-free occupancy of the acquired property for a period of 30 days, commencing with the next 1st or 15th day of the month after title vests in the condemnor, whichever is sooner. Any person occupying the property after the date that title vests in the condemnor is liable to the condemnor for all waste committed or allowed by the occupant on the lands condemned during the occupancy. The condemnor has the right to possession when the persons who

occupied the acquired property vacate, or hold over beyond the vacation date established by the condemnor, whichever is sooner, except as provided under par. (c). If the condemnor is denied the right of possession, the condemnor may, upon 48 hours' notice to the occupant, apply to the circuit court where the property is located for a writ of assistance to be put in possession. *The circuit court shall grant the writ of assistance if all jurisdictional requirements have been complied with, if the award has been paid or tendered as required and if the condemnor has made a comparable replacement property available to the occupants, except as provided under par. (c).*

(c) *The condemnor may not require the persons who occupied the premises on the date that title vested in the condemnor to vacate until a comparable replacement property is made available.* This paragraph does not apply to any person who waives his or her right to receive relocation benefits or services under s. 32.197 or who is not a displaced person, as defined under s. 32.19 (2) (e), unless the acquired property is part of a program or project receiving federal financial assistance.

(Emphasis added.)

¶ 12.   WISCONSIN STAT. § 32.19, entitled "Additional items payable," provides for payments to persons displaced by public projects and includes payments to both owners and tenants and to businesses, farm operations, and individuals in dwellings, all as defined in this section. The declaration of purpose in § 32.19(1) provides as follows:

(1) DECLARATION OF PURPOSE. The legislature declares that it is in the public interest that persons displaced by any public project be fairly compensated by payment for the property acquired and other losses hereinafter described and suffered as the result of programs designed for the benefit of the public as a whole;

463

and the legislature further finds and declares that, notwithstanding subch. II, or any other provision of law, payment of such relocation assistance and assistance in the acquisition of replacement housing are proper costs of the construction of public improvements . . . .

¶ 13. A "comparable replacement business" is defined in WIS. STAT. § 32.19(2)(c) as:

[A] replacement business which, when compared with the business premises being acquired by the condemnor, is adequate for the needs of the business, is reasonably similar in all major characteristics, is functionally equivalent with respect to condition, state of repair, land area, building square footage required, access to transportation, utilities and public service, is available on the market, meets all applicable federal, state or local codes required of the particular business being conducted, is within reasonable proximity of the business acquired and is suited for the same type of business conducted by the acquired business at the time of acquisition.

¶ 14. WISCONSIN STAT. § 32.19(3)(a) provides for payment of certain actual moving expenses as well as actual reasonable expenses necessary to reestablish a business not to exceed $10,000, with an exception; under para. (b) a displaced business may elect instead to receive a fixed payment established by regulation, which is capped at $20,000. Paragraph (c) provides for an additional payment for persons who moved their businesses, elected payments under para. (a), and within two years of the receipt of that payment discontinued their business, up to a combined maximum of $20,000.[6]

---

[6] WISCONSIN STAT. § 32.19(3) provides:

(3) RELOCATION PAYMENTS. Any condemnor which proceeds with the acquisition of real and personal property for purposes of any

¶ 15. Wisconsin Stat. § 32.19(4m)(b) addresses payments to business owners who rent and are displaced if such an owner either rents or purchases a comparable replacement business within two years after vacating the acquired property. The condemnor must pay the owner of the displaced business based on

project for which the power of condemnation may be exercised, or undertakes a program or project that causes a person to be a displaced person, shall make fair and reasonable relocation payments to displaced persons, business concerns and farm operations under this section. Payments shall be made as follows:

(a) *Moving expenses; actual.* The condemnor shall compensate a displaced person for the actual and reasonable expenses of moving the displaced person and his or her family, business or farm operation, including personal property; actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation, but not to exceed an amount equal to the reasonable expenses that would have been required to relocate such property; actual reasonable expenses in searching for a replacement business or farm operation; and actual reasonable expenses necessary to reestablish a business or farm operation, not to exceed $10,000, unless compensation for such expenses is included in the payment provided under sub. (4m).

(b) *Moving expenses; optional fixed payments.*

1. 'Dwellings.' Any displaced person who moves from a dwelling and who elects to accept the payments authorized by this paragraph in lieu of the payments authorized by par. (a) may receive an expense and dislocation allowance, determined according to a schedule established by the department of commerce.

2. 'Business and farm operations.' Any displaced person who moves or discontinues his or her business or farm operation, is eligible under criteria established by the department of commerce by rule and elects to accept payment authorized under this paragraph in lieu of the payment authorized under par. (a), may receive a fixed payment in an amount determined according to criteria established by the department of commerce by rule, except that such payment shall not be less than $1,000 nor more than $20,000. A person whose sole business at the displacement dwelling is the rental of such property to others is not eligible for a payment under this subdivision.

465

a formula that compares the monthly rent paid for the acquired property to the monthly rent of a comparable replacement business in an amount not to exceed $30,000.[7]

(c) *Optional payment for businesses.* Any displaced person who moves his or her business, and elects to accept the payment authorized in par. (a), may, if otherwise qualified under par. (b) 2., elect to receive the payment authorized under par. (b) 2., minus whatever payment the displaced person received under par. (a), if the displaced person discontinues the business within 2 years of the date of receipt of payment under par. (a), provided that the displaced person meets eligibility criteria established by the department of commerce by rule. In no event may the total combined payment be less than $1,000 nor more than $20,000.

[7] WISCONSIN STAT. § 32.19(4m)(b) provides in full:

(b) *Tenant-occupied business or farm operation.* In addition to amounts otherwise authorized by this subchapter, the condemnor shall make a payment to any tenant displaced person who has owned and occupied the business operation, or owned the farm operation, for not less than one year prior to initiation of negotiations for the acquisition of the real property on which the business or farm operation lies or, if displacement is not a direct result of acquisition, such other event as determined by the department of commerce, and who actually rents or purchases a comparable replacement business or farm operation for the displaced business or farm operation within 2 years after the date the person vacates the acquired property. At the option of the tenant displaced person, such payment shall be either:

1. The amount, not to exceed $30,000, which is necessary to lease or rent a comparable replacement business or farm operation for a period of 4 years. The payment shall be computed by determining the average monthly rent paid for the property from which the person was displaced for the 12 months prior to the initiation of negotiations or, if displacement is not a direct result of acquisition, such other event as determined by the department of commerce and the monthly rent of a comparable replacement business or farm operation, and multiplying the difference by 48; or

2. If the tenant displaced person elects to purchase a comparable replacement business or farm operation, the amount determined under subd. 1. plus expenses under par. (a) 3.

466

¶ 16. Focusing first on the language of WIS. STAT. § 32.05(8)(c), that section plainly prohibits a condemnor from requiring the occupant of the premises to vacate "until a comparable replacement property is made available," with certain exceptions not applicable here. Subsection (8)(b) repeats that same obligation in the context of the issuance of a writ of assistance:  having "made a comparable replacement property available to the occupants . . ." (with the exceptions provided for in para. (c)) is one of the conditions for the issuance of the writ. While there is no definition of "comparable replacement property" in § 32.05, WIS. STAT. § 32.19(2)(b), (c), and (d) define "comparable dwelling," "comparable replacement business," and "comparable replacement farm operation," each of these definitions corresponding to the categories of displaced persons defined in paras. (e) and (h) of § 32.19(2). Neither party here has suggested that "comparable replacement property" in § 32.05(8)(b) and (c) has any meaning other than that defined in § 32.19(2)(b)-(d). We conclude that "comparable replacement property" in § 32.05(8)(b) and (c) plainly refers to those three categories of replacement properties as defined in § 32.19(2)(b)-(d). The applicable definition in this case is that of a "comparable replacement business" in § 32.19(2)(c), as the City has implicitly conceded in its arguments.

¶ 17. We conclude there is nothing in the language of WIS. STAT. § 32.19(3) or (4m), or any other

---

If the owner of the displaced business also owned the real property acquired by the condemnor and actually purchases a comparable replacement business within two years, the condemnor must pay that person an amount not to exceed $50,000 as provided in WIS. STAT. § 32.19(4m)(a).

subsection of Wis. Stat. §§ 32.05 or 32.19, that supports the City's position that it need not make available a comparable replacement property meeting the definitions of § 32.19(2)(b)-(d), but instead need only identify property that could be made comparable and offer the payments required by § 32.19(3) and (4m).

¶ 18. The moving expenses described in Wis. Stat. § 32.19(3)(a) plainly are expenses that would be incurred in relocating to a comparable replacement property and cannot reasonably be read as limiting the condemnor's obligation to make a comparable replacement property available. The payments under subsec. (4m)(b) are explicitly based on a comparison of rent for the acquired property to rent for a comparable replacement business and thus cannot reasonably be read as a limitation on the obligation to make available a comparable replacement property. The evident purpose of subsec. (4m)(b) is to provide some compensation to a displaced business owner where the rent for a comparable replacement business is higher than that previously paid; no language in the statute suggests that this compensation affects the condemnor's obligation to make available a comparable replacement business property.

¶ 19. Similarly, the City's argument that the payment in Wis. Stat. § 32.19(3)(c) is intended to fulfill the condemnor's obligation when there is no comparable replacement property has no basis in the statutory language. The comparable replacement property must be made available before the occupant can be required to vacate the acquired property, Wis. Stat. § 32.05(8)(c), whereas the payment under § 32.19(3)(c) is available only after the occupant has vacated. The payment in this paragraph is available when a business owner moves the business, obtains payment for moving ex-

penses, and then within two years of that payment decides to discontinue the business at the new location.

¶ 20.  Having found no statutory language that supports the City's position, we turn to the cases on which it relies:  *Bassinger*, 163 Wis. 2d 1029, and *Dotty Dumpling's*, 257 Wis. 2d 377.

¶ 21.  In *Bassinger*, we summarized WIS. STAT. § 32.05(8) as establishing three conditions precedent to the issuance of a writ of assistance:  (1) compliance with all jurisdictional requirements; (2) payment or tender of the award; and (3) making available comparable replacement property to the occupants. 163 Wis. 2d at 1035. As it concerns the third condition, the issue in *Bassinger* was whether the owner of a marina business that rented slips to boat owners but conducted no commercial activities on the property in connection with the marina operation was an "occupant" within the meaning of § 32.05(8) such that the condemnor had to make available a comparable replacement property in order to obtain a writ of assistance. *Bassinger*, 163 Wis. 2d at 1038–39, 1042. We concluded a person is an "occupant" under § 32.05(8) only if the person is a displaced person under WIS. STAT. § 32.19; and we held the marina owners did not meet the definition of displaced persons in WIS. ADMIN. CODE § ILHR 202.01(14)(b)10 (now WIS. ADMIN. CODE § COMM 202.01(14)(b)10). *Bassinger*, 163 Wis. 2d at 1042–43.

¶ 22.  In this case, there is no dispute that CC Midwest is a displaced person under WIS. STAT. § 32.19 and an occupant under WIS. STAT. § 32.05(8). *Bassinger* does not address a condemnor's obligation under § 32.05(8) to make available to an occupant a comparable replacement property before requiring the occupant to move.

469

¶ 23. In *Dotty Dumpling's,* on which the City primarily relies, the owner of both the acquired property and a restaurant business on the property argued that a comparable replacement property had not been "made available" within the meaning of WIS. STAT. § 32.05(8)(b) and (c) because it would cost one million dollars more than the condemnation award and the relocation payments to purchase and remodel the only property identified that met the owner's criteria. *Dotty Dumpling's,* 257 Wis. 2d 377, ¶¶ 4, 10.[8] The owner's position, as we phrased it, was that "a court may not grant a condemnor possession of condemned premises until a replacement property deemed acceptable by the condemnee is procured, regardless of its acquisition costs, all of which the condemnor must bear or tender." *Id.,* ¶ 26. We rejected this position as unreasonable because it placed an open-ended obligation on the condemnor to provide relocation payments in order to make the owner whole and made the specific payment provisions in WIS. STAT. § 32.19 meaningless. *Dotty Dumpling's,* 257 Wis. 2d 377, ¶¶ 26–27.

¶ 24. The City here contends that CC Midwest's argument is the same one we rejected in *Dotty Dumpling's,* and that under *Dotty Dumpling's* the City met its obligation to make a replacement property available under WIS. STAT. § 32.05(8) once it identified a "potential" replacement property and offered the payments to which CC Midwest is entitled under WIS. STAT. § 32.19. The City places particular emphasis on our statement in *Dotty Dumpling's* that

---

[8] The condemnor had made a jurisdictional offer of $583,680. *Dotty Dumpling's Dowry, Ltd. v. Cmty. Dev. Auth. of the City of Madison,* 2002 WI App 200, ¶ 3, 257 Wis. 2d 377, 651 N.W.2d 1.

> by identifying potential replacement properties, obtaining renovation cost estimates for a property in which Dotty expressed some interest, tendering the maximum business replacement payment, and offering to reimburse Dotty for its other statutorily authorized relocation expenses, [the condemnor] "made available" to Dotty a comparable replacement property *"to the extent required by the relocation assistance law."*

*Id.*, ¶ 21 (citing *Bassinger*, 163 Wis. 2d at 1040).

¶ 25.   However, the City overlooks the difference in the issue decided in *Dotty Dumpling's* and that raised in this case. In *Dotty Dumpling's* the owner did not argue that the property identified by the condemnor was not a "comparable replacement business" within the meaning of Wis. Stat. § 32.19(2)(c); rather the issue was whether "made available" in Wis. Stat. § 32.05(8)(b) and (c) meant that the condemnor had to pay the owner sums greater than those specified in § 32.19. Thus the quoted statement from *Dotty Dumpling's* is not properly read as holding that the identified property there met the definition of a "comparable replacement business" under § 32.19(2)(c). Rather, the statement expresses our resolution of the issue we did decide:   the owner was not entitled under § 32.05(8) to a replacement property that met the owner's criteria and for which the condemnor paid whatever it cost to purchase and remodel over and above the jurisdictional offer and the payments to which the owner was entitled under § 32.19.

¶ 26.   Unlike the owner in *Dotty Dumpling's*, CC Midwest is not arguing that "ma[k]e available" in Wis. Stat. § 32.05(8) means "pay for," which was the essence of the owner's argument in *Dotty Dumpling's*. Rather, CC Midwest's position is that "ma[king] available" a

comparable replacement property under § 32.05(8)(b) and (c) means identifying a property that meets the applicable definition in WIS. STAT. § 32.19(2)(b)-(d).

¶ 27.   The difference between the issue decided in *Dotty Dumpling's* and that raised by CC Midwest is significant because our statutory analysis in *Dotty Dumpling's* rested on the premise that it was unreasonable to suppose the legislature intended to impose an open-ended financial obligation on the condemnor when the legislature had very specifically set forth the payments the condemnor was obligated to make in WIS. STAT. § 32.19. In contrast, CC Midwest is not suggesting that the condemnor has any financial obligation greater than that specified in § 32.19:   its position is that, when the legislature provides that the condemnor make available a comparable replacement property and defines comparable replacement properties in § 32.19(2)(b)-(d), the legislature intends that the condemnor must identify a property meeting the applicable definition before it can require the occupant to vacate. Rather than rendering meaningless the payment provisions of § 32.19 as the owner's position did in *Dotty Dumpling's*, CC Midwest construes WIS. STAT. § 32.05(8) in light of § 32.19, which, as we have said in *Bassinger* and *Dotty Dumpling's*, is the proper course. The City's position, on the other hand, renders the requirement of a comparable replacement property in § 32.05(8)(b) and (c) and the definitions in § 32.19(2)(b)-(d) meaningless:   under the City's view it may require an occupant to vacate even if it does not identify a comparable replacement property meeting the applicable statutory definition.

¶ 28.   We are persuaded that the issue presented on this appeal is not resolved by *Bassinger* or *Dotty Dumpling's*. A requirement that a condemnor identify a

comparable replacement property meeting the applicable definition in Wis. Stat. § 32.19(2)(b)-(d) before making an occupant vacate does not impose an "open-ended" financial obligation on the condemnor and does not render the provisions for payments in § 32.19 meaningless. It is not inconsistent for the legislature to provide that an occupant may not be required to vacate unless the condemnor has identified a comparable replacement property meeting the statutory definition, even though the condemnor's financial obligations to assist the occupant are limited by the provisions for payments in § 32.19.

¶ 29. The City argues that, even if *Bassinger* and *Dotty Dumpling's* do not resolve the issue in this case, we should reject CC Midwest's proposed construction of Wis. Stat. §§ 32.05(8) and 32.19 because it is unreasonable. The City does not identify any ambiguity in the statutory language. Rather, the City asserts that the legislature could not have intended that a condemnor must identify a property meeting the definition of § 32.19(2)(b)-(d) before it can require an occupant to vacate because that would impose too great a barrier to necessary public projects. The effect of such a construction, the City argues, would be that projects needed to improve or provide public transportation and other public services could not occur if there were no comparable replacement properties meeting the applicable statutory definition. According to the City, this is an absurd result that we can and should avoid by construing § 32.05(8)(b) and (c) as not requiring a condemnor to identify a comparable replacement property meeting the applicable statutory definition before it requires an occupant to vacate, so long as the condemnor has identified some property that could be made comparable and has offered all the payments to which the

occupant is entitled under § 32.19 and all other assistance to which the occupant may be entitled under statute and regulation.

¶ 30. We acknowledge that construing WIS. STAT. § 32.05(8)(b) and (c) to require that the condemnor identify a comparable replacement property meeting the applicable definition in WIS. STAT. § 32.19(2)(b)-(d) may impose significant impediments to public projects in cases where no such property exists. However, we do not agree our construction will lead to absurd results. While there are important public policies that favor facilitating the condemnation of property and removal of occupants when the property is necessary for projects that benefit the public, there are also important public policies that favor ensuring that displaced occupants have a comparable property to move to. It is for the legislature to decide the proper balance, within the parameters of constitutional requirements, between these policies when there is a conflict. The legislature could reasonably decide that a condemnor should not be able to remove an occupant if there is no comparable replacement property for it to move to, even if this means modifying, or even not going ahead with, a desirable public project.

¶ 31. We are satisfied that the legislature has expressed this intent in the plain language of WIS. STAT. § 32.05(8)(b) and (c) and WIS. STAT. § 32.19(2)(b)-(d). The legislature could have stated that the condemnor could require an occupant to vacate if no comparable replacement property existed; it could have defined comparable replacement property in less restrictive ways; it could have provided that if the condemnor offers all the payments to which an occupant is entitled under § 32.19, it has satisfied the obligation to make

available a comparable replacement property before requiring the occupant to vacate. However, the legislature has done none of these things. Instead it has chosen to plainly state that a condemnor may not require an occupant to vacate "until a comparable replacement property is made available," § 32.05(8)(c), and it has chosen to very specifically define three categories of comparable replacement properties in § 32.19(2)(b)-(d).[9]

¶ 32. Applying the plain language of WIS. STAT. § 32.05(8)(b) and (c) and WIS. STAT. § 32.19(2)(b)-(d) in light of the judicial construction of "made available" from *Dotty Dumpling's*, we conclude that the City could not require CC Midwest to vacate the property the City had acquired without identifying a comparable replacement property meeting the definition of § 32.19(2)(c). Because it is undisputed that none of the properties the City identified met that definition, the City was not entitled to a writ of assistance. Accordingly, we reverse the circuit court's judgment issuing the writ and direct it to enter a judgment denying the writ.[10]

[9] We are not presented with facts that create a dispute regarding whether any of the properties identified by the City are a "comparable replacement business" property within the meaning of WIS. STAT. § 32.19(2)(c). It is readily apparent that none of the identified properties comes close to being "reasonably similar in all major characteristics" and "functionally equivalent" with respect to factors such as "condition" and "square footage." *See* § 32.19(2)(c). This leads us to two observations. First, the City's concession that none of the properties identified are comparable replacement business properties is appropriate. Second, this case does not provide a vehicle for clarifying how similar an identified property must be in order to fit the definition in § 32.19(2)(c).

[10] At oral argument, CC Midwest stated that it had vacated the property after the circuit court issued the writ and the

*By the Court.*—Judgment reversed and cause remanded with directions.

building was then torn down within a few days. In CC Midwest's view, if we reverse the circuit court's judgment issuing the writ, that ends this action and any remedies it might have against the City would be the subject of another action. The City does not suggest that any further proceedings are necessary in the circuit court if we agree with CC Midwest that the City was not entitled to the writ.