MILWAUKEE BOARD OF SCHOOL DIRECTORS,
Plaintiff-Appellant,

v.

BITEC, INC., a/k/a Bitec Bitumen Technology,
GRS Wisconsin, Inc., a/k/a General Roofing,
Continental Casualty Company and Burlington
Insurance Company, Defendants,

ATLANTIC MUTUAL INSURANCE COMPANY,
Defendant-Respondent.

Court of Appeals

No. 2008AP3022. *Oral argument July 22, 2009.*
*—Decided September 9, 2009.*

**2009 WI App 155**

(Also reported in 775 N.W.2d 127.)

616

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Grant F. Langley*, city attorney, and *Miriam R. Horwitz*, assistant city attorney, with oral argument by *Miriam R. Horwitz*.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Kendall W. Harrison* and *Joshua P. Dau* of *Godfrey & Kahn, S.C.*, of Milwaukee, with oral argument by *Kendall W. Harrison*.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. CURLEY, P.J. Milwaukee Board of School Directors (MBSD) appeals the order granting summary judgment to Atlantic Mutual Insurance Company (Atlantic Mutual).[1] At issue is whether Atlantic Mutual in its capacity as surety on a performance bond is liable for its principal's, Specialty Associates, Inc., n/k/a GRS Wisconsin Inc. (SAI), warranty obligations under the construction contract. We agree with MBSD that Atlantic Mutual would be liable if SAI is found at fault.

---

[1] In addition to dismissing MBSD's claims against Atlantic Mutual, the order also granted summary judgment to Atlantic Mutual on BITEC, Inc.'s (BITEC) cross-claim. BITEC supplied the roofing materials involved. In its cross-claim, BITEC alleged, among other things, that "by the terms of its contract with BITEC, [SAI] agreed to indemnify and save harmless BITEC for any claim for property damage caused by faulty application . . . ." This ruling is not at issue because BITEC has not appealed that portion of the trial court order. *See* Wis. Stat. Rule 809.10(2)(a) (2007–08).

All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

618

Accordingly, we reverse that portion of the trial court's ruling at summary judgment dismissing MBSD's claims against Atlantic Mutual and remand for further proceedings consistent with this decision.

## I. BACKGROUND.

¶ 2. In late summer 2002, MBSD solicited bids for the replacement of the roof at the Cooper Elementary School in Milwaukee, Wisconsin. MBSD sent bid documents to potential bidders providing them with information regarding the scope of the project. Included within these documents was the provision that the bidder would be required to obtain a performance bond. In addition, the general conditions of the bid documents specified: "**Article 12. MATERIALS AND WORK-MANSHIP:** . . . All Work of every kind shall be delivered upon completion of the Project in a perfect and undamaged condition, free of flaws or defects."

¶ 3. In September 2002, MBSD contracted with SAI to install the new roofing system. SAI was to receive $361,495 as payment for the project. As required by the bid documents, Atlantic Mutual provided the performance bond on the project as SAI's surety. Atlantic Mutual was also a party to the contract, which incorporated the bid documents and SAI's proposal.

¶ 4. SAI completed the project by December 26, 2002, and issued a "Five Year Limited Roof Warranty" to MBSD. This went into effect for five years, starting on December 26, 2002. MBSD made its final payment to SAI in February 2003.

¶ 5. In the summer of 2005, MBSD noticed problems with the roof. In November 2007, MBSD filed suit against BITEC (the supplier of the roofing materials involved), BITEC's insurer, SAI, and SAI's insurer. After

filing suit, MBSD learned that it could not obtain relief from SAI because SAI was bankrupt and had obtained a discharge of any obligation to MBSD. MBSD then amended its complaint and sued Atlantic Mutual, which, as noted, issued a performance bond for the project. In its amended complaint, MBSD alleged: "SAI, Atlantic's principal, breached its contract obligations by, among other things, failing to properly install the roofing materials, failing to inspect work completely and properly, and allowing insufficient adhesion of materials that allowed water and weather to infiltrate and cause damage to the building roof and structure."

¶ 6. Atlantic Mutual subsequently moved for summary judgment on grounds that its duties under the original roofing contract had "long ago" expired and on the basis that it was not a party to the five-year limited roof warranty issued by SAI. Its motion was granted. MBSD now appeals. The specific contractual language at issue will be provided in the remainder of this opinion.

## II. ANALYSIS.

### A. Standard of review.

¶ 7. This case was decided on summary judgment; thus, our review is *de novo. See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2). Further, Atlantic Mutual is a paid surety; as such, its contract is interpreted and applied as an insurance contract. *See Wiegel v. Sentry*

*Indem. Co.*, 94 Wis. 2d 172, 179, 287 N.W.2d 796 (1980) (explaining that "the contracts of *[p]aid sureties* are to be treated as insurance contracts"). Our review of a trial court's interpretation of a contract is also *de novo. Teacher Ret. Sys. of Texas v. Badger XVI Ltd. P'ship*, 205 Wis. 2d 532, 555, 556 N.W.2d 415 (Ct. App. 1996). In this regard, the following principles guide our analysis:

> The lodestar of contract interpretation is the intent of the parties. In ascertaining the intent of the parties, contract terms should be given their plain or ordinary meaning. If the contract is unambiguous, our attempt to determine the parties' intent ends with the four corners of the contract, without consideration of extrinsic evidence.

*Huml v. Vlazny*, 2006 WI 87, ¶ 52, 293 Wis. 2d 169, 716 N.W.2d 807 (citations omitted).

*B. Atlantic Mutual is liable under its performance bond.*

¶ 8. MBSD argues that Atlantic Mutual is liable under the performance bond, which did not expire when the roof was installed, and further asserts that, due to the coextensive nature of Atlantic Mutual's and SAI's liability, Atlantic Mutual liability "includes performance to correct latent defects over the same time period for which its principal is liable." Atlantic Mutual disagrees, contending that its liability under the bond for post-completion obligations is limited by contractual language requiring a one-year warranty. Because the problems with the roof were discovered after the expiration of that period, Atlantic Mutual asserts that it is not liable.

¶ 9. "The rule in Wisconsin is that a surety's obligation is derived from its principal and the liability of the surety is measured by the liability of the principal." *Waukesha Concrete Prods. Co. v. Capitol Indem. Corp.*, 127 Wis. 2d 332, 339, 379 N.W.2d 333 (Ct. App. 1985); *see also Riley Constr. Co. v. Schillmoeller & Krofl Co.*, 70 Wis. 2d 900, 905, 236 N.W.2d 195 (1975) ("Because the surety's obligation is derived from that of the principal debtor, the liability of the surety is ordinarily measured by the liability of the principal. If the principal is not liable to the claimant, then the surety is not liable either."). "The bond issued by the surety and the contract which it secures should be construed together." *Waukesha Concrete*, 127 Wis. 2d at 339.

¶ 10. Reviewing the performance bond first, we note that it incorporates the underlying construction contract insofar as it is conditioned upon SAI's faithful performance of its contractual obligations. The performance bond reads, in relevant part:

> NOW, THEREFORE, if the Principal [SAI] shall well, truly and faithfully perform its duties, all the undertakings, covenants, terms, conditions, and agreements of said contract during the original term thereof, and any extensions thereof which may be granted by Owner [MBSD], with or without notice to the Surety [Atlantic Mutual], and if he/she shall satisfy all claims and demands incurred under such contract, and shall fully indemnify and save harmless the Owner [MBSD] from all costs and damages which it may suffer by reason of failure to do so, and shall reimburse and repay the Owner [MBSD] all outlay and expense which the Owner [MBSD] may incur in making good any default, then this obligation shall be void; otherwise to remain in full force and effect.

Thus, the bond becomes void when SAI has faithfully performed all of the terms of the contract and has indemnified MBSD for all costs suffered due to any failure on the part of SAI to fully perform the contract.

¶ 11. MBSD highlights the absence of a durational limit in the bond's language. Furthermore, a sample copy of the performance bond was included in the bid package; consequently, as MBSD points out, "the surety knew the terms prior to bonding the bid for the project and could have set its premium accordingly." We conclude that Atlantic Mutual had alternatives available to it, not just in the form of determining the appropriate premium. For example, it could have negotiated for the inclusion of an express completion date in the performance bond, a specific provision limiting its financial exposure, or one stating that any warranty language in the contract was excluded by the terms of the bond. *See* 4 PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., BRUNER & O'CONNOR ON CONSTRUCTION LAW § 12:22 (updated May 2009) ("Where the bonded contract provides that the post-completion express warranty is the owner's exclusive remedy for correction of latent defects, neither the contractor nor its surety is liable for latent defects discovered after the expiration of the warranty period."); MARILYN KLINGER ET AL., THE LAW OF SURETYSHIP 99 (Edward G. Gallagher ed., 2d ed. 2000) ("[A]lthough it is rarely done, the surety can also expressly set forth that the surety's sole obligation is to guarantee completion of the construction contract and nothing more."); *see, e.g., Kiva Constr. & Eng'g, Inc. v. International Fid. Ins. Co.*, 749 F. Supp. 753, 756 (W.D. La. 1990) (holding that performance bond's two-year suit limitation barred a claim asserted for breach of ten-year warranty contained in the underlying bonded contract); *General State Auth. v. Sutter Corp.*, 403 A.2d

1022, 1026 (Pa. Commw. Ct. 1979) (concluding that where bond expressly limited the dollar amount of surety's liability, the surety could not be liable beyond the express limits). Here, the absence of such language, coupled with the fact that the bond applies without limitation to "all the undertakings, covenants, terms, conditions, and agreements of said contract," leads us to agree with MBSD that Atlantic Mutual's liability under the bond necessarily encompasses warranty work and other contractual responsibility on the part of SAI with respect to post-completion obligations.[2]

¶ 12. We turn next to the contractual terms at issue. The specifications for the project made clear that SAI was required to provide a five-year warranty on its workmanship related to the roofing and a manufacturer's twelve-year warranty on materials:

SECTION 07514: BUILT-UP ASPHALT BITUMI-NOUS ROOFING

. . . .

1.13 WARRANTY[3]

---

[2] A treatise on this topic provides:

Where the bond itself provides that it will cover warranty claims, the surety will be liable for the obligee's damages resulting from the principal's breach of the warranty provision. The surety may also be liable where the contract contains a warranty provision and the bond expressly incorporates the underlying contract.

MARILYN KLINGER ET AL., THE LAW OF SURETYSHIP 116 (Edward G. Gallagher ed., 2d ed. 2000).

[3] The "STANDARD GENERAL CONDITIONS OF THE CONTRACT" define "Omitted Phrases" as follows: "Omitted phrases or words, as 'The Contractor shall', [sic] . . . are intentional and shall be supplied by inference." (Some uppercasing omitted.)

A. Provide warranties under provisions of General Conditions. Warranties shall commence on Date of Substantial Completion.

B. Provide a **five (5) year** workmanship warranty and a **twelve (12) year** No Dollar Limit manufacturer's warranty covering the materials.

C. Warranties shall cover damage resulting from failure to resist penetration of water. .

D. Repair leaks and replace or repair roofing and membrane flashing exhibiting any defects in either materials or workmanship during the warranty period without charge of any kind.

(Footnote added.)[4] In addition to these specific warranty requirements related to roofing, the contract contains a general one-year warranty on workmanship, which applies to the roofing project as a whole. This provision, however, is limited by contractual language found under the heading "STANDARD GENERAL CONDITIONS OF THE CONTRACT," stating as follows:

*Unless modified in the detailed specifications covering his Work,* the Contractor shall be bound by the following:

"The Contractor hereby agrees to remedy and make good in the manner and time directed by the Director of Facilities and Maintenance Services any defective workmanship or materials appearing within one year from the date of award of final payment of the Work for the Board, provided that such defects are not clearly

[4] Language virtually identical to that in 1.13 of the specifications related to the built-up asphalt bituminous roofing is also found in the specific section of the contract related to the modified bitumen sheet roofing.

> due to abuse or misuse by employees of the Board or occupants of the Project after its occupancy."

(Emphasis added). The "[u]nless modified in the detailed specifications" language makes clear that additional warranties, as provided in the technical specifications, will trump this general one-year warranty provision.

¶ 13. This conclusion is supported by *Milwaukee County v. H. Neidner & Co.*, 220 Wis. 185, 263 N.W. 468 (1935), *modified on other grounds by* 220 Wis. 185, 265 N.W. 226 (1936). Milwaukee County sued H. Neidner & Company and its surety for performance of a contract and for damages resulting from the defective installation of tiling in the shower baths of a hospital. *Id.* at 189. On appeal, the surety company argued that the trial court erred in awarding judgment against it because it was only liable for work that failed within one year, and the action was not commenced within that timeframe. *Id.* at 192. The bond in that case, like the one at issue here, was conditioned upon H. Neidner & Company performing all of the terms and conditions of the contract, which encompassed the plans and specifications. *Id.* at 203. One such condition was "that the tiling should stand for two years from the time of final payment." *Id.* The surety argued that a general provision providing for a one-year warranty applicable to the entire building was at odds with the more specific two-year warranty applicable to the tiling such that they were meaningless. *Id.* The court disagreed, holding:

> [The] general provision appl[ied] to the whole building and to work done thereon which is not covered by a special guaranty. As the tiling was covered by a special two-year guaranty, and buckled and cracked within two

626

years, H. Neidner & Company is liable under its special guaranty and the surety company is liable on its bond.

*Id.*

¶ 14. We are persuaded that the same rationale applies here and defeats Atlantic Mutual's argument that the five-year workmanship warranty specific to roofing does not apply to it. Although Wisconsin case law is limited on the issue before us—a surety's liability for post-completion guarantees on its principal's work —case law from outside jurisdictions and treatises are insightful. Our research reveals that where a contractor fails to perform its obligations under the contract in compliance with the contract terms and where the bond is "conditioned upon the contractor's faithful performance of all of its obligations under the contract, a majority of courts have held the performance bond surety liable for latent defects in its principal's work, whether those defects are discovered before or after the applicable warranty period, if any, has run." *See* The Law of Suretyship 116; *see also Tudor Dev. Group, Inc. v. U.S. Fid. & Guar. Co.*, 692 F. Supp. 461, 465 (M.D. Pa. 1988) (reviewing performance bond language incorporating a construction contract and discharging the surety's obligation only when the contractor "promptly and faithfully" performed under the contract and concluding that surety could be held responsible for the contractor's alleged violations of express and implied contractual duties); *Hunters Pointe Partners Ltd. P'ship v. U.S. Fid. & Guar. Co.*, 486 N.W.2d 136, 138 (Mich. Ct. App. 1992) (noting "that in jurisdictions that have addressed this issue, the courts read the performance bond together with the construction contract and found that a surety could be held liable on the performance bond for a breach of the construction contract by the

627

contractor that results in latent defects"); *Congregation of St. Peter's Roman Catholic Church of Gueydan v. Simon*, 497 So. 2d 409, 411, 413–14 (La. Ct. App. 1986) (analyzing performance bond conditioned on principal "well, truly and faithfully" performing all of the contractual obligations assumed and holding that "[t]he concept of a breach or a default on a contract is not limited to the obvious case of the contract's not being performed but extends to any major departure from the contract, even though the building itself, or other construction itself, is actually physically completed").

¶ 15. According to Atlantic Mutual, by concluding that it is liable for the five-year workmanship warranty specified in the contract, "then, by that same logic, Atlantic Mutual would be a party to the twelve-year manufacturer's warranty issued by BITEC." We agree that this is the logical consequence of our holding. However, as MBSD points out, SAI (and by extension Atlantic Mutual) and BITEC were free to, and in fact did, contract to allocate certain risks related to this arrangement between them. Moreover, had these terms not been acceptable to Atlantic Mutual, it could have either sought to narrow the scope of the performance bond it issued or it could have passed on the opportunity to provide a performance bond to SAI. Instead, by bonding SAI's performance of "its duties, all the undertakings, covenants, terms, conditions, and agreements of said contract," Atlantic Mutual signed on for this responsibility. Notwithstanding, MBSD acknowledged both in its brief and at oral argument that the twelve-year manufacturer's warranty is not before the court because it does not apply to the facts of this case.

¶ 16. In addition, Atlantic Mutual takes the position that the use of the word "provide" in the warranty language above contemplates a specific warranty to be issued in the future and that the remaining provisions

found in 1.13 are not warranties in and of themselves, but rather, explain what needed to be included in a separate warranty when it was issued. As it was not a party to the five-year limited roof warranty and was not obligated to provide warranties pursuant to 1.13, Atlantic Mutual asserts that it is not liable. We are not convinced.

¶ 17. Atlantic Mutual's obligation under its performance bond was not to make sure that SAI provided MBSD a separate five-year roof warranty, as it asserts; rather, it agreed to bond SAI's performance of work that was to be completed "well, truly and faithfully," which pursuant to the contract terms was to last for five years. This allegedly was not done here. Furthermore, the five-year limited term roof warranty is not a separate contract. It was not signed by MBSD, its terms were not negotiated, and there was no separate consideration for it.[5] Atlantic Mutual contends the consideration supporting the separate warranty can be found in MBSD's agreement to make final payment in exchange for the

---

[5] The purpose of SAI's issuing the separate five-year limited roof warranty remains somewhat unclear despite MBSD's attempts to clarify this issue and harmonize the warranty with the contract provisions. MBSD submits:

> SAI provided its general five-year workmanship warranty as required in subsections 1.13A and 1.13B, which applies to the entire roofing system. Subsection C and D are additional promises, over and above the usual warranty provisions to be expected from the contractor and manufacturer. Those provisions are protections . . . MBSD bargained for in regard to this particular membrane roof.

According to Atlantic Mutual, MBSD's argument renders the five-year limited roof warranty surplusage. *See Goebel v. First Fed. Sav. & Loan Ass'n of Racine,* 83 Wis. 2d 668, 680, 266 N.W.2d 352 (1978) ("[A] contract is to be construed so as to give a reasonable meaning to each provision of the contract, and . . . courts must avoid a construction which renders portions of a contract meaningless, inexplicable or mere surplusage.").

warranty; from the agreement in the warranty that MBSD would give SAI employees "free access to the roof during regular business hours"; and that it agreed to reimburse SAI "for all reasonable costs" of inspection of the roof if access to it was limited. We disagree.

¶ 18. First, final payment could not serve as consideration for the inducement to provide a warranty given that 1.13A states that "[w]arranties shall commence on Date of Substantial Completion," which preceded the date of final payment. As to Atlantic Mutual's remaining contentions on this point, we are persuaded by MBSD's reasoning, which goes as follows:

> [T]his is a public works contract that had been accepted after a bidding process. There was nothing more to negotiate, or that could have been negotiated, after the MBSD had accepted SAI's bid and had awarded the contract. It is specious to assert that the MBSD intended to enter into another, new contract at a later date to

Atlantic Mutual, however, would have us disregard fundamental principles of suretyship law and the interpretation of those principles set forth in treatises and case law from other jurisdictions, by arguing: "The only interpretation that gives meaning to all contractual terms and the referenced warranties is one that intends the warranties to be separate from the underlying contract, issued and backed only by the warranting party. Under that proper reading, SAI is the sole party responsible for the SAI Warranty." Atlantic Mutual asks that we construe 1.13D ("Repair leaks and replace or repair roofing and membrane flashing exhibiting any defects in either materials or workmanship during the warranty period without charge of any kind.") as setting forth information so that the contractor will have basic knowledge about the type of warranty that would need to be provided for the project in the future, as opposed to creating a guaranty in and of itself.

While we acknowledge this is not a clear-cut case, we believe MBSD's reading best comports with the principles of suretyship law and the contract terms as they are written.

secure the warranties required under the roofing contract. There is no evidence of any Board action to that effect. Nor is there any evidence of an exchange of information in this regard between agents for SAI or the MBSD authorized to enter into contract or contract modifications.

¶ 19. The parties do not dispute that the alleged defects arose within the five-year warranty period specified in the construction contract. Consequently, assuming the alleged defects related to SAI's workmanship, Atlantic Mutual is liable under the terms of its performance bond. Accordingly, we conclude that the trial court erred in granting summary judgment to Atlantic Mutual, and we reverse and remand for further proceedings consistent with this opinion.[6]

*By the Court.*—Order reversed in part and cause remanded for further proceedings consistent with this opinion.

[6] Our conclusion is further supported by Wisconsin's objective of protecting taxpayers by requiring public owners, here MBSD, to ensure that adequate bonding for public works projects is secured. *See* Wis. Stat. § 779.14; *see also Holmen Concrete Prods. Co. v. Hardy Constr. Co.*, 2004 WI App 165, ¶ 19, 276 Wis. 2d 126, 686 N.W.2d 705 ("Municipal liability for failure to ensure that a contractor furnishes a proper bond protects subcontractors, taxpayers and the municipality itself."). MBSD did what it was required to do under the statute.

In light of this resolution, we do not address MBSD's argument related to whether other contractual provisions create liability on the part of Atlantic Mutual. *See Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (if a decision on one point disposes of an appeal, we will not decide other issues raised).